**In re Eyad KHALIL, Debtor.**

**Eyad Khalil, Appellant/Cross–Appellee,**

v.

**Developers Surety and Indemnity Company, Appellee/Cross–Appellant.**

**BAP Nos. CC–07–1164–KPaBa, CC–07–1171–KPaBa.
Bankruptcy No. SA 05–12795–ES.
Adv. No. SA 05–01621–ES.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Oct. 24, 2007.

Filed Nov. 6, 2007.

Ordered Published Nov. 28, 2007.

Mark M. Sharf, Esq., Law Office of Mark M. Sharf, Encino, CA, for Appellant/Cross–Appellee.

Andrew K. Mauthe, Esq., Irvine, CA, for Appellee/Cross–Appellant.

Before: KLEIN, PAPPAS and BARDWIL,[1] Bankruptcy Judges.

**1.** Hon. Robert S. Bardwil, Bankruptcy Judge for the Eastern District of California, sitting by designation.

**2.** Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure,

## OPINION

KLEIN, Bankruptcy Judge.

Debtor Eyad Khalil appeals from the bankruptcy court's judgment denying his discharge under § 727(a)(4)[2] for knowingly and fraudulently making a false oath or account in, or in connection with, this bankruptcy case. Creditor Developers Surety and Indemnity Company ("DSI") cross-appeals seeking denial of Debtor's discharge under other provisions of § 727(a).

Debtor alleges that the bankruptcy court applied an incorrect standard for determining his intent: reckless indifference to the accuracy of bankruptcy schedules and statement of financial affairs, rather than knowing and fraudulent intent. Debtor also argues that the bankruptcy court was required to find a motive for his misstatements and omissions. We disagree on both counts, and also reject DSI's challenges to the judgment in its cross-appeal. We publish to clarify that evidence of reckless indifference to accuracy may be probative of intent even though reckless indifference alone does not suffice to establish the requisite intent. Accordingly, we AFFIRM.

## I. FACTS

Debtor filed his voluntary Chapter 7 petition on April 25, 2005 (the "Petition Date") and his bankruptcy schedules and statement of financial affairs on May 10, 2005. DSI filed a complaint objecting to Debtor's discharge and trial was held October 25 and 26, 2006. Debtor's direct

Rules 1001–9036, as enacted and promulgated prior to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 119 Stat. 23, because the case from which this appeal arises was filed before its effective date (generally October 17, 2005).

testimony was presented by declaration. Much of DSI's evidence consisted of excerpts from Debtor's deposition testimony that were read into the record and admitted without objection. *See* Tr., Oct. 25, 2007, pp. 89:20–90:25.

Debtor does not dispute that his bankruptcy schedules and statement of financial affairs omit several transfers involving his family members and that they are not listed as creditors or co-debtors. Debtor's principal defense is that, at least as of the Petition Date and perhaps even now, he did not believe that such disclosures were necessary.

DSI focuses primarily on three transactions. First, Debtor did not disclose approximately $100,000 that he received from his father in 2003. DSI argues that this was income that should have been listed in Debtor's statement of financial affairs, in response to questions 1 and 2 asking Debtor to state the amount of pre-petition "income" that he received in the current year and the two previous years. *See* Official Form 7. The initial source of the money was Atek Corporation ("Atek"), an S Corporation which has now ceased operations but was then engaged in construction focusing on public works projects. Debtor's father was the record owner of 50% of the shares and Debtor's uncle Ali Mohammed Taha ("Uncle") held the other 50%. Debtor testified that his father "was entrusted with my share in the company since [its] inception" and held it solely for Debtor's benefit; "I was the holder of [the] California Contractor's License"; and the 50% share "was transferred into my name eventually." Tr., Oct. 25, 2006, pp. 32:11–24, 121:17–122:3 (quoting Ex. 16 p. 176:11–22). Atek distributed about $111,699 to Debtor's father, who paid income taxes on that money and transferred the balance to Debtor. *Id.* pp. 32:24–33:9 (quoting Ex. 16 pp. 176:2–177:5). Debtor testified that he did not consider this to be income. His counsel asked what Debtor understood to be income, which led to the following exchange:

A Income? Money you get for doing something, for doing work.

Q Okay, and if you receive income for doing work, do you report that on your tax return as income?

A Yes.

Q Was the money you received from your father from this profit in 2001 income to you?

A No. I did discuss that with my accountant and our accountant knows that my dad was save people for my work [sic] and our accountant explained that as long as my dad pay taxes on that income, what my dad does with that money, whether he spends it or gives it to me, is our business, as long as he pay taxes for the income.

Tr., pp. 97:15–98:16.

The second transaction involves Atek's sale of some unimproved residential real property (the "Big Bear Lot") in January of 2005 for $148,642.70. Atek distributed $40,000 to Debtor and another $73,000 to Debtor's brother, Khalil Jaj Khalil ("Brother"). DSI alleges that some of this money was used to defray Debtor's personal expenses and repay a debt that Debtor owed Brother. Debtor did not disclose these transactions as income. Nor did Debtor disclose any payments of personal debts to Brother or other persons in response to question 3.a. of his statement of financial affairs, which requires Debtor to list all payments on loans and other debts aggregating more than $600 to any "creditor" within 90 days before the Petition Date, or question 3.b., which requires Debtor to list all payments within one year prior to the Petition Date to or for the benefit of "creditors" who are or were insiders. *See* Official Form 7.

At trial Debtor admitted that approximately $3,000 out of the $40,000 was used to pay for foundation work on his personal residence, and an unspecified amount was used to pay a law firm that he consulted for both corporate and personal bankruptcy advice. Tr., Oct. 25, 2006, pp. 49:4–50:19, 100:13–21, 102:2–23 (quoting Ex. 15 pp. 93:2–94:2). As for the $73,000 transferred to Brother, Debtor testified:

> I was worried that the bonding companies would get a hold of the money in my company account and I put it in my brother's account so he can pay *my* bills . . . *[m]y* lawyer bills, *my personal* bills, and he used the money to do that.

Tr., Oct. 25, 2006, p. 47:3–11 (quoting Ex. 15 p. 79:17–23) (emphasis added).

DSI's counsel confirmed that Brother spent money "on your personal bills, is that correct?" *Id.* p. 48:8–10 (quoting Ex. 15 p. 80:13). Debtor answered, "And for lawyers." *Id.* p. 48:10 (quoting Ex. 15 p. 80:14). Despite these unequivocal statements, the evidence is somewhat conflicting because it is not entirely clear what Debtor considered to be "personal" expenses. Some time after the testimony quoted above, DSI's counsel and Debtor had the following exchange:

Q Did you, at any time during 1996 to the time of [Atek's] closure, write any checks on the corporate account for your personal expenses?

A Yes.

Q And what type of expenses did you pay?

A Mostly when I, you know, buy material. When I am on sites I buy material for, you know, things that the project is missing. Workers needing tools, stuff like that, that hasn't been planned properly, you know, or things that came up because of the size of our work that occurred almost daily or weekly.

Q Okay, perhaps you misunderstood my question. My question was, did, at any time, you or anyone from the corporation write a corporate check to pay for your personal expenses.

A "Personal expenses" as in—

Q Mortgage, car payments, utilities?

A No, no.

Tr., Oct. 25, 2006, pp. 126:20–127:12.

Regardless what expenses were or were not paid from the sale of the Big Bear Lot, Debtor admitted that at the time he filed his bankruptcy schedules he owed money to his brother. Tr., Oct. 25, 2006, p. 116:4. He explained that he did not list Brother as a creditor because "I knew he wasn't going to come after me for the money and he knew I was filing for bankruptcy . . . but he was helping me." *Id.* pp. 98:25–99:13. Debtor concluded, "[h]e's not a creditor." *Id.* p. 99:13. Debtor later had the following exchange with DSI's counsel:

Q Harkening back to your testimony earlier about your definition of income; that definition was you go to work and you get paid, wasn't it? Or am I mischaracterizing?

A That's the way I understand it, yes.

Q What about dividend income? . . . That's income too, isn't it?

A Yes.

Q How about if somebody pays a debt for you; isn't that income? Don't you get the benefit of that?

A No.

Q No? Just free, huh?

A If my brother is paying—

Q I'm not asking about your brother, I'm just asking hypothetically.

A It depends on whether they are expecting repayment or not, I suppose.

Q Oh, I see. If it's a loan it's not income . . .

Q May [I] reiterate for a moment, Mr. Khalil; when your bankruptcy was filed, or when these papers were filed which was just a few days afterwards, you personally did not believe that you owed your brother any money, is that right?

A I did not—I knew that my brother would not come after me for that money and therefore I—he knew that I was filing for bankruptcy and therefore I *did not owe him any money.*

Tr., Oct. 25, 2006, pp. 112:2–20, 115:8–15 (emphasis added).

Later, however, Debtor appears to contradict the emphasized language. He was asked, "So is your testimony, Mr. Khalil, that when you filed this case you did not owe your brother any money?" he responded, "*I owed my brother money* but ... I didn't list him because I didn't think he would come after me for that money." Tr., Oct. 25, 2006, p. 116:2–6 (emphasis added). When DSI's counsel asked Debtor to confirm that he intended to repay his family and friends for funds advanced by them, he answered: "That's in my heart, not contractual. I'm not obligated to do so." Tr., Oct. 26, 2006, p. 13:15–22.

The third transaction on which DSI focuses is Debtor's acquisition of Uncle's 50% interest in Atek at the end of 2003 or beginning of 2004 for an agreed purchase price of $2 million. Tr., Oct. 25, 2006, p. 54:1–5. Debtor testified that transfers of $50,000 and $150,000 from Atek to Uncle in March of 2004 were in part payment of that $2 million debt. *Id.* pp. 86:4–11, 88:5–7. DSI argues that these transfers were for Debtor's benefit and should have been disclosed as part of his income. Debtor's counsel asked, did you understand that this $200,000 transfer from Atek to Uncle was "income to you?" *Id.* p. 100:2. Debtor responded:

A How can ... my company pay something and it be income? Of course not. Did you say "income"?

Q Income, as we discussed before.

A It's—no.

*Id.* p. 100:3–7.

DSI argues that Debtor should have listed Uncle as a creditor on his bankruptcy Schedule F (general unsecured creditors). Debtor's direct testimony declaration states:

> With the closure of [Atek] prior to my bankruptcy filing, I did not believe that [Uncle] expected payment from me for the purchase of his stock in Atek, an agreement that I previously entered into, or for reimbursement for any money he might have to pay to the corporate creditors, since the source of my income to pay him was from the operation of Atek. In addition, since [he] is my uncle, I did not believe that he would come after me for payment, thus I did not consider him to be a creditor of mine when I filed bankruptcy.

Direct Testimony Decl., ¶ 3.c.

At trial Debtor testified that he did not personally owe money to Uncle. Tr., Oct. 25, 2006, p. 98:19–24. According to Debtor, the written agreement for purchase and sale of Atek for $2 million was supplemented by an oral agreement that the $2 million would only be paid by Atek, not by Debtor personally. Tr., Oct. 25, 2006, pp. 136:14–19, 138:21–139:1; Tr., Oct. 26, 2006, pp. 25:11–22, 26:16–25, 28:21–24, 58:24–59:7.

DSI also objects that Uncle and his wife are not listed as co-debtors in bankruptcy Schedule H (co-debtors) even though they are jointly obligated with Debtor as guarantors of Atek's obligations to DSI and another bonding company. Debtor's direct testimony states:

It was my understanding that as a result of [Uncle] selling his stock in [Atek] and resigning as an officer of the corporation, and based upon a sale agreement that was entered into, he and his wife were no longer liable to any of the corporate creditors. Thus, I did not think I was required to include them as co-debtors in my schedules. I had no intention of misleading the Court or creditors by the omission of this information. I later found out that notwithstanding my belief as to the effect of the sale of the stock and resignation, their liability for these debts remained—a fact that the affected creditors must have known regardless of the manner in which my schedules were completed.

Direct Testimony Decl. ¶ 3.b.

Debtor also acknowledges that he under-reported what he acknowledges to be income in 2003 through 2005. For 2003, Debtor explained that he "looked at the 2003 *corporate* tax return which included 'Shareholder's Share of Income, Credits, Deductions' which shows ordinary income for me at $372,981 instead of the $400,-000+ figure from my *personal* 2003 return." Direct Testimony Decl. ¶ 3.h. (emphasis added). For 2004, Debtor's statement of financial affairs shows "Estimated gross income from [Atek]" of $35,000 but in an examination by DSI Debtor admitted that this was only payroll and "I found out that I had ... made some draws" that added another $14,000 or so to his income. Tr., Oct. 25, 2006, pp. 56:15–57:12 (quoting Ex. 14 p. 63:17–64:10).

The bankruptcy court gave its oral ruling on December 18, 2006. After rejecting DSI's claims under § 727(a)(2), (3), and (5) the bankruptcy court turned to § 727(a)(4)(A).[3] It noted that, as Debtor admits, he "understated gross income for 2003 by approximately $76,000" and "understated income for 2004 by approximately $14,000." Tr., Dec. 18, 2006, p. 9:7–9. In addition, the bankruptcy court found that at least some portion of the amounts paid to lawyers and to Debtor's brother was used for Debtor's personal benefit, but was not disclosed in Debtor's statement of financial affairs (*i.e.*, neither disclosed as income nor as payments to creditors). Tr., Dec. 18, 2006, p. 10:10–15.

Similarly, [the bankruptcy court stated,] money that the Debtor received—I believe he referred to this as a gift from his father, approximately $100,000 that was paid out to the father as a dividend from [Atek]. Again, this was not disclosed on the Debtor's statement of financial affairs.

And I do find this significant, because in reviewing the deposition testimony that was presented into evidence, the Debtor testified at his deposition that the father's interest in [Atek] was really in name only, and that is that at all times it was the arrangement between [him] and his father that the father was holding the interest for him, that it was really his interest and that he had put the money into the company.

Tr., Dec. 18, 2006, pp. 10:18–11:5.

The bankruptcy court found that Debtor's omissions are "numerous and/or substantial in terms of dollar amount" and that Debtor's explanation "that these were relatives, [that] he didn't think that they would come after him, I really found not persuasive." *Id.* p. 13:10–14. The bankruptcy court noted that bankruptcy Schedule F requires that "all" entities that are

---

**3.** Section 727(a)(4)(A) provides, "(a) The court shall grant the debtor a discharge, unless—... (4) the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account[.]"

owed money be listed and "[t]here is no exception for family members, there is no exception for friends, there is no exception for entities that one believes are not going to seek to recover [their] claims." *Id.* p. 13:14–20. The bankruptcy court was also troubled that, even after DSI's complaint was filed, Debtor did not amend his bankruptcy schedules and statement of financial affairs to disclose all omitted or misstated items, and even at trial he testified that these documents were accurate "in the face of obvious inconsistencies and omissions." *Id.* pp. 13:21–14:12. The bankruptcy court noted that, as Debtor admits, this was "not a matter of mistake or forgetting that a debt existed" but a "conscious decision" not to list debts or family members. *Id.* p. 14:15–20. *See also* Tr., Oct. 25, 2006, p. 116:7–22.

The bankruptcy court entered a judgment denying Debtor's discharge under § 727(a)(4) on April 18, 2007. Debtor filed a timely notice of appeal and DSI filed a timely cross-appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction over this core proceeding under 28 U.S.C. §§ 157(b)(2)(J) and 1334. We have jurisdiction under 28 U.S.C. § 158(a)(1), (b), and (c).

## III. STANDARDS OF REVIEW

■ ... the Ninth Circuit standard of review of a judgment on an objection to discharge is that: (1) the court's determinations of the historical facts are reviewed for clear error; (2) the selection of the applicable legal rules under § 727 is reviewed de novo; and (3) the application of the facts to those rules requiring the exercise of judgments about values animating the rules is reviewed de novo. *Searles v. Riley (In re Searles)*, 317 B.R. 368, 373 (9th Cir. BAP 2004) (citations

omitted), aff'd, 212 Fed.Appx. 589 (9th Cir. 2006).

■ "When there are two permissible views of the evidence, the trial judge's choice between them cannot be clearly erroneous." *Village Nurseries v. Gould (In re Baldwin Builders)*, 232 B.R. 406, 410 (9th Cir. BAP 1999) (citation omitted).

## IV. ISSUES

A. Did the bankruptcy court apply the correct standard of intent under § 727(a)(4)(A)?

B. On the cross-appeal, did the bankruptcy court err in denying DSI's claims under § 727(a)(2), (3), and (5)?

## V. DISCUSSION

Section 727 provides, in relevant part:

§ 727. *Discharge*

(a) The court shall grant the debtor a discharge, unless—

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to

act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

. . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

§ 727(a)(2), (3), (4)(A), and (5).

■ DSI bears the burden of proving by a preponderance of the evidence that Debtor's discharge should be denied. *Searles,* 317 B.R. at 376. The bankruptcy court noted that discharge provisions are liberally construed in favor of debtors and strictly against the person objecting to the discharge. *See Beauchamp v. Hoose (In re Beauchamp),* 236 B.R. 727, 730 (9th Cir. BAP 1999), *aff'd,* 5 Fed.Appx. 743 (9th Cir.2001). That does not, however, change the preponderance of evidence standard. Rather, it has been held to mean that actual, rather than constructive, intent is required. *See Garcia v. Coombs (In re Coombs),* 193 B.R. 557, 560 (Bankr. S.D.Cal.1996) (strict construction of statute in favor of discharge is rule of "statutory interpretation" not "rule to apply to consideration of evidence").

A. *Section 727(a)(4)(A)*

1. *In general*

■ Section 727(a)(4)(A) denies a discharge to a debtor who "knowingly and fraudulently" makes a false oath or account in the course of the bankruptcy case. § 727(a)(4)(A). A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath. *See Searles,* 317

B.R. at 377; *Roberts v. Erhard (In re Roberts),* 331 B.R. 876, 882 (9th Cir. BAP 2005), *aff'd,* 241 Fed.Appx. 420 (9th Cir.). "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Fogal Legware of Switz., Inc. v. Wills (In re Wills),* 243 B.R. 58, 63 (9th Cir. BAP 1999) (citing *Aubrey v. Thomas (In re Aubrey),* 111 B.R. 268, 274 (9th Cir. BAP 1990)). That said, a false statement or omission that has no impact on a bankruptcy case is not material and does not provide grounds for denial of a discharge under § 727(a)(4)(A). *Id.*

■ DSI must show by a preponderance of the evidence that: (1) Debtor made such a false statement or omission, (2) regarding a material fact, and (3) did so knowingly and fraudulently. *See Searles,* 317 B.R. at 377; *Roberts,* 331 B.R. at 882 (same test, broken down into four elements). The first of these three elements is satisfied. Debtor has cited no authority, either before the bankruptcy court or on this appeal, that his relatives were not creditors simply because they would not "come after" him for the money he had borrowed from them. Whatever Debtor allegedly believed, the definition of "creditor," incorporating the definition of "claim," is very broad and Debtor has shown no error in the bankruptcy court's conclusion that his relatives are in fact creditors. *See* § 101(5), (10). Nor has Debtor cited authority that transfers of money from Atek were anything but income within the meaning of the statement of financial affairs (Official Form 7), regardless of whether the money came to him through his father or was used to pay his creditors (through him or through Brother).

■ The next element is that the false statement or omission must involve a material fact. A fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Wills*, 243 B.R. at 62 (citations omitted). Debtor's briefs make no argument that his transactions with his family, and the debts and payments related to those transactions, are not material under this broad test. *See Coombs*, 193 B.R. at 566 (distinguishing between broad test of materiality and narrower test of intent).

■ The last element is intent. Debtor must have "knowingly and fraudulently" made a false oath or account. Section 727(a)(4)(A). A debtor "acts knowingly if he or she acts deliberately and consciously." *Roberts*, 331 B.R. at 883 (citation omitted). In this case Debtor admits that he made a deliberate and conscious choice to omit his family and transactions with them from his bankruptcy papers, but he claims to have done so through an honest belief that he was not required to list them, or through innocent oversight. As for acting fraudulently, we held in *Roberts* that the elements of common law fraud substantially overlap the elements of a claim under Section 727(a)(4)(A), except that "materiality replaces the elements of reliance and proximately caused damage," so that the creditor must show: "(1) [that] the debtor made the representations [*e.g.*, a false statement or omission in bankruptcy schedules]; (2) that at the time *he knew they were false*; [and] (3) that he made them with the *intention and purpose of deceiving the creditors* ...." *Id.* at 884 (citations omitted, emphasis added).

### 2. Recklessness

In *Roberts* we reversed a judgment denying a discharge under § 727(a)(4)(A) be-cause the bankruptcy court only found that the debtor exhibited a "careless and reckless approach to the important duty of disclosure in sworn bankruptcy filings." *Roberts*, 331 B.R. at 884. We held that "recklessness does not measure up to the statutory requirement of 'knowing' misconduct." *Id.*

■ On the other hand, recklessness can be probative of fraudulent intent. In *Wills* we stated in dicta that a court "may find the requisite intent where there has been a pattern of falsity or from a debtor's *reckless* indifference to or disregard of the truth." *Wills*, 243 B.R. at 64 (emphasis added) (citing *Coombs*, 193 B.R. at 564). We specifically left unresolved in *Roberts* whether "a reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of fraudulent intent necessary to bar a discharge...." *Roberts*, 331 B.R. at 884 n. 4 (quoting *Mondore v. Mondore (In re Mondore)*, 326 B.R. 214, 217 (Bankr. W.D.N.Y.2005)). We now address that issue.

There is no Ninth Circuit authority deciding this issue, but numerous courts including five other circuit courts have held a reckless indifference to the truth can support denial of discharge under § 727(a)(4)(A). *See, e.g., Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987) (debtor's omissions evidenced "reckless indifference to truth equivalent to fraud for purposes of § 727(a)(4)(A)"); *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1584 n. 4 (2d Cir.1983) (citing authority that reckless indifference to truth is the equivalent of fraud, and that a pattern of reckless and cavalier disregard for truth can be serious enough to supply the necessary fraudulent intent required by § 727(a)(4)(A)); *Beaubouef v. Beaubouef*

*(In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992) (multiple falsehoods, combined with "failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules," constituted "reckless indifference to the truth and, therefore, the requisite intent to deceive") (citation omitted); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 686 (6th Cir.2000) ("A reckless disregard as to whether a representation is true will also satisfy the intent requirement") (citation omitted); *In re Chavin*, 150 F.3d 726, 728 (7th Cir.1998) ("not caring whether some representation is true or false— the state of mind known as 'reckless disregard'—is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material") (citations omitted); *Martin Marietta Materials Southwest, Inc. v. Lee (In re Lee)*, 309 B.R. 468 (Bankr.W.D.Tex.2004) (following *Beaubouef*). *See generally* C.C. Marvel, Annotation, *False Oath or Account as Bar to Discharge in Bankruptcy Proceedings*, 59 A.L.R.2d 791, 1958 WL 11371 (1958, updated weekly per Westlaw) ("Annotation, *False Oath or Account*"); § 9.5 (reckless disregard).

These cases could be read as equating recklessness with a knowing and fraudulent intent, but that goes too far. The statute specifically requires that the debtor make a false oath or account "knowingly and fraudulently." § 727(a)(4)(A). As one court put it:

> [A] debtor does not necessarily act with fraudulent intent even if he knowingly makes a false oath, and § 727(a)(4)(A), by requiring both knowledge and the intent to defraud, implicitly acknowledges that fact. It would certainly be anomalous to hold that a finding of reckless disregard on the part of a debtor for the accuracy of her schedules obviates the need to establish fraudulent intent, even though the Code permits no such "short cut" with respect to a debtor who signs schedules containing information which she knows to be false.

*United States v. Sumpter (In re Sumpter)*, 136 B.R. 690, 696 (Bankr.E.D.Mich.1991), aff'd on other grounds, 170 B.R. 908 (E.D.Mich.1994), aff'd in part, rev'd in part, 64 F.3d 663 (6th Cir.1995) (table).

On the other hand, intent usually must be proven by circumstantial evidence or inferences drawn from the debtor's course of conduct. *See, e.g., Searles*, 317 B.R. at 377 (evidence supported "factual inference" that debtor "intended to list a sum below the trustee's radar screen"); *Roberts*, 331 B.R. at 884 (fraudulent intent "may be established by inferences drawn from [debtor's] course of conduct"); *Wills*, 243 B.R. at 64 (same). Recklessness can be part of that circumstantial evidence.

*Coombs* strikes the appropriate balance. It is critical of too easy a reliance on recklessness, but as we noted in Wills it also stands for the general proposition that a court *"may* find the requisite intent where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth." *Wills*, 243 B.R. at 64 (emphasis added) (citing *Coombs*, 193 B.R. at 564). The *Coombs* court said it well:

> Neither sloppiness nor an absence of effort by the debtor supports, *by itself,* an inference of fraud. Courts which hold otherwise are simply devising a court-made prophylactic rule that the debtor must make substantial effort to provide accurate and complete schedules. Had the Congress intended to make such a rule, it could have done so easily, as it did with § 727(a)(3) (failure to keep adequate books and records), and (a)(5) (failure to adequately explain the loss of assets), neither of which have

an express element of fraudulent intent. [Citation omitted.] But the Congress did not do so, and it is not for the courts to create new bars to discharge under § 727(a), or to so distort a requisite element as to make it no element at all.

The essential point is that there must be something about the adduced facts and circumstances which suggest that the debtor intended to defraud creditors or the estate. For instance, multiple omissions of material assets or information may well support an *inference of fraud* if the nature of the assets or transactions suggests that the debtor was aware of them at the time of preparing the schedules and that there was something about the assets or transactions which, because of their size or nature, a debtor might want to conceal.

*Coombs,* 193 B.R. at 565–66 (emphasis added).

### 3. *Application of the law to this case*

 Debtor claims that he did not know that his representations were false and he did not have the intention and purpose of deceiving creditors. According to Debtor, (1) he inadvertently used the wrong documents to measure his gross income in 2003 and 2004, and he truly believed (2) that roughly $100,000 he received from Atek (through his father) was not "income," (3) that his obligation to repay his family did not make them "creditors," (4) that his agreement to acquire 50% of Atek from Uncle for $2 million did not make Uncle a "creditor," (5) that Uncle and his wife were not co-debtors to DSI and another bonding company despite written guarantees, and (6) that payments of Debtor's debts through Brother and other transfers did not need to be reported in his bankruptcy schedules and statement of financial affairs. The bankruptcy court did not believe him.

Although the bankruptcy court did not explicitly say that Debtor acted with a knowing and fraudulent intent, its oral ruling leaves us with no doubt that it properly applied the correct legal standards described above. As part of that ruling, it quoted the following passage from *Lee:*

The party objecting to the debtor's discharge under [§ 727(a)(4)(A)] has the burden to show by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) *the debtor knew the statement was false;* (4) *the debtor made the statement with fraudulent intent;* and (5) the statement related materially to the bankruptcy case. False oaths sufficient to justify the denial of discharge under section 727(a)(4)(A) include: (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings. A discharge cannot be denied when items are omitted from the schedules by honest mistake. However, the existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, *can* be found to constitute *reckless indifference to the truth* satisfying the requisite finding of intent to deceive.

*Lee,* 309 B.R. at 477 (emphasis added, citations omitted); *see* Tr., Dec. 18, 2006, pp. 7:23–8:25.

According to Debtor, the above reference to a "reckless indifference to the truth" shows that the bankruptcy court applied a recklessness standard rather than requiring DSI to prove his knowing and fraudulent intent. We disagree. First, Debtor ignores the clear statements earlier in the same paragraph that § 727(a)(4)(A) is only satisfied if "the debt-

or *knew* the statement was false" and "the debtor made the statement with *fraudulent intent.*" *Lee,* 309 B.R. at 477 (emphasis added). Tr., Dec. 18, 2006, p. 8:2–4. Second, the bankruptcy court later summarized *Lee* (correctly in our view) as requiring an "intent to deceive," not just Debtor's conscious omissions; but *Lee* also permits that intent to be inferred from appropriate circumstantial evidence:

> The existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, *can* be found to constitute a basis for a finding of *intent to deceive.* In other words, the court need not find that there is any actual admission by a debtor of any intent to deceive, but rather in looking at all of the circumstances, whether or not such intent may be *inferred.*

Tr., Dec. 18, 2006, pp. 12:17–13:5 (emphasis added) (summarizing *Lee*).

Third and finally, the bankruptcy court's factual findings overwhelmingly support that inference. At the end of its oral ruling it reiterated that

> the requisite intent is supported ... by the number of omissions, by the magnitude of the omissions, by the ... conscious exclusion of information, even at the time of trial, and no attempt to correct the inaccuracies.

Tr., Dec. 18, 2006, p. 15:3–8.

These are exactly the sort of circumstances referred to in *Coombs* (and *Lee*) as supporting an inference of knowing and fraudulent intent. Debtor has shown no error in the bankruptcy court's reliance on inferences.

### 4. *Motive*

■ Motive can support a finding of knowing and fraudulent intent, but it is not indispensable. A bankruptcy court might find that a debtor's reckless indifference to the truth is part of an attempt to fly "below the trustee's radar screen" (*Searles,* 317 B.R. at 377), or to protect family or friends from intrusive discovery or preference or fraudulent transfer actions, or simply to make investigation difficult for the bankruptcy trustee or creditors. Alternatively, the court might never know the debtor's motive, but the number of misstatements or omissions, or the size or nature of a single one, might suffice to support a finding that a debtor knowingly and fraudulently made a false oath or account. *See Hansen v. Moore (In re Hansen),* 368 B.R. 868, 878 (9th Cir. BAP 2007) ("The sheer number of material inaccuracies contained in schedules that debtor, an attorney, admittedly reviewed and revised twice suffices as circumstantial evidence to support the finding that the 'knowingly and fraudulently' element of § 727(a)(4) was proven.").

Debtor cites *White v. Nielsen (In re Nielsen),* 383 F.3d 922 (9th Cir.2004), for the proposition that the bankruptcy court must find a motive to defraud. That case did not involve an objection to discharge. It involved a creditor's attempt to revoke the debtors' discharge under § 727(d)(1), which applies if the discharge "was obtained through the fraud of the debtor." § 727(d)(1). The creditor in that case alleged that the debtors intentionally omitted her from their list of creditors, but she did not show how, even if she had known of the bankruptcy case in time to object to the discharge, she would have had any grounds to do so. The Ninth Circuit recognized that debtors might "purposely leave a creditor off the list if that creditor would have knowledge of assets," or for other reasons. *See id.* at 926. This implies that such a motive could be circumstantial evidence of grounds to deny the

debtors' discharge, but the Ninth Circuit never held that a motive had to be proven. Debtor's reliance on *Nielsen* is misplaced.

Debtor argues that any duty to amend his bankruptcy schedules and statement of financial affairs relates only to omitted assets and not to omitted creditors (*i.e.*, his family, and transactions with them). Building on this supposed foundation, Debtor argues that DSI cannot prove a knowing and fraudulent intent without proving a motive, such as an intent to hide assets that DSI otherwise would not have known about. Debtor is wrong on the facts and the law.

 First, Debtor did not simply omit creditors. The bankruptcy court found that he omitted income, and Debtor has shown no error in that finding. Debtor belatedly disclosed some of that income, when deposed about it, but that is not the same as disclosing it voluntarily. *See Beauchamp*, 236 B.R. at 732–34.

 Second, nondisclosure of creditors (and debts) can be just as important as nondisclosure of assets. Information regarding business and personal dealings can lead to discovery of assets, potentially avoidable transfers, or other relevant information such as grounds to deny a debtor's discharge. "A false statement or omission may be material even if it does not cause direct financial prejudice to creditors." *Wills*, 243 B.R. at 63 (cataloguing cases). *See generally* Annotation, *False Oath or Account*, 59 A.L.R.2d 791, § 18 (omission of creditors or debts). Debtor cites our decision in *Searles*, which acknowledges that "the rules may be inexact about [the debtor's] continuing duty to amend schedules to reflect *property* of the estate accurately," but *Searles* focused on property because that was what was at issue in that case. *See Searles*, 317 B.R. at 378–79 and nn. 6–8 (emphasis added). Nothing in *Searles* held or implied that the duty to amend applies only to assets and not to liabilities.

For all of these reasons Debtor has shown no error in the bankruptcy court's judgment. Debtor's discharge was properly denied under § 727(a)(4)(A).

### B. DSI's claims under § 727(a)(2), (3), and (5)

DSI's alternative grounds for denial of Debtor's discharge might be relevant if Debtor takes a further appeal to the Ninth Circuit, but DSI's brief on this appeal makes no substantive arguments under § 727(a)(2), (3), or (5). The panel may decline to address an issue that is summarily mentioned in the brief but not fully briefed. *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1005 n. 1 (9th Cir.1995). Issues that are raised but not supported by argument are typically deemed abandoned. *Acosta–Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir.1992). We decline to address DSI's other grounds for denial of Debtor's discharge.

## VI. CONCLUSION

Debtor's discharge cannot be denied under § 727(a)(4)(A) unless his false statements or omissions were made "knowingly and fraudulently." Recklessness by itself will not suffice, but recklessness combined with other circumstances can support an inference that he acted with knowing and fraudulent intent. The bankruptcy court found that Debtor made numerous, substantial, and conscious omissions from his bankruptcy schedules and statement of financial affairs, that Debtor's explanations were not persuasive, that he chose not to correct these inaccuracies when he had the opportunity, and that he had the requisite intent to deceive. Debtor has shown no error in these findings or the bankruptcy court's application of the law. The judg-

ment denying his discharge under § 727(a)(4)(A) is AFFIRMED.