NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP Nos. AZ-12-1114-DJuHl |
| CLARENCE THOMAS CUMMINGS AND PAMELA K. CUMMINGS, | Bk. No.  09-10576-RTB |
| Debtors. | Adv. No. 09-01383-RTB |
| CLARENCE THOMAS CUMMINGS; PAMELA K. CUMMINGS, | |
| Appellants, | |
| v. | **M E M O R A N D U M**[1] |
| UNITED STATES TRUSTEE, | |
| Appellee. | |

Argued and Submitted on September 20, 2012
at Phoenix, Arizona

Filed - October 3, 2012

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Redfield T. Baum, Sr., Bankruptcy Judge, Presiding

Appearances:     Wesley Denton Ray, Esq. of Polsinelli Shughart PC
for Appellants; Jennifer A. Giaimo, Esq. for
Appellee.

Before:  DUNN, JURY and HOULE,[2] Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[2] Hon. Mark D. Houle, U.S. Bankruptcy Judge for the Central District of California, sitting by designation.

The debtors, Clarence Thomas ("Thomas") and Pamela K. Cummings ("Pamela")(collectively, "the Cummings"), appeal the bankruptcy court's order denying their chapter 7 discharge[3] under § 727(a)(4)(A).[4]  We AFFIRM.

**FACTS**

Thomas has worked in real estate management for over forty years.  Thirty-two years ago, Thomas became owner of All State Management Co., Inc. ("All State"),[5] which managed various apartment complexes and small commercial buildings in several

---

[3] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[4] The United States Trustee ("UST") sought denial of the Cummings' discharge under § 727(a)(2)(B) and (a)(4)(A) in its complaint against the Cummings ("complaint").  The bankruptcy court apparently denied the Cummings their discharge under § 727(a)(2)(A) and (B) and (a)(4)(A).  The bankruptcy court did not cite, however, the specific subsections of § 727(a)(2) in its "Minute Entry/Order for Matter Taken Under Advisement" ("minute entry order") wherein it set forth its factual findings and legal conclusions.
The Cummings appeal the bankruptcy court's determinations under § 727(a)(2)(A) and (B) and (a)(4)(A).  Because we conclude that the bankruptcy court's determination to deny the Cummings' discharge under § 727(a)(4)(A) was sufficiently supported by the record, we need not examine its determinations under § 727(a)(2)(A) and (B).  See Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008)("We may affirm on any ground supported by the record").

[5] The Cummings filed their original Schedule B on June 1, 2009 (main case docket no. 11).  They amended their Schedule B five times, filing an amended Schedule B on June 15, 2009 (main case docket no. 29), June 22, 2009 (main case docket no. 39), August 20, 2009 (main case docket no. 122), September 24, 2009 (main case docket no. 160), and September 20, 2010 (main case docket no. 323).  In the original Schedule B and in each amended Schedule B, the Cummings disclosed that only Thomas had an interest in All State, with the value of his interest "unknown."

2

states, including Arizona.[6]  All State continued to operate until June 2009.[7]

On March 2, 2009, approximately two months before the Cummings filed for bankruptcy, Thomas formed First Beacon Management Co., LLC ("First Beacon"), another real property management company.[8]  Thomas held a 45% member interest and Pamela held a 50% member interest in First Beacon.  Jeannie Wetzel, president of All State (and later of First Beacon), held the remaining 5% member interest.  Thomas entered into a management agreement with First Beacon on May 1, 2009.

According to Thomas, First Beacon commenced operations in June 2009.[9]  He later revealed, however, that First Beacon

---

[6] Thomas created numerous entities, with each entity typically owning a particular parcel of real property.  Thomas would locate a parcel of real property, usually an apartment complex, and then would seek investors who would put up the equity to purchase the real property.  When the parcel of real property was sold, Thomas received a certain percentage commission between 15% and 25%, and the investors were repaid their investments plus a return.  All State usually managed the real property on behalf of the entity.

[7] All State filed its own chapter 7 bankruptcy petition on October 7, 2010 (bankruptcy case no. 10-32401).  The chapter 7 trustee apparently filed an asset report on December 8, 2010 (main case docket no. 16) and a final account report on April 6, 2012 (main case docket no. 64).  He also sought to be discharged as trustee (main case docket no. 64), to which the UST did not object (main case docket no. 65).  To date, All State's chapter 7 bankruptcy case remains open.

[8] Thomas filed First Beacon's Articles of Organization on March 2, 2009.

[9] Thomas testified at trial that All State terminated most, if not all, of its management agreements.  He further testified
(continued...)

3

already was operating when he received and reviewed an initial draft of the Cummings' bankruptcy schedules sometime before May 2009.

As part of setting up First Beacon, Thomas transferred client accounts, including escrow accounts,[10] from All State to First Beacon.[11] He also opened a bank account for First Beacon in March 2009.

First Beacon's bank account had a closing balance of $1,100, as of March 31, 2009, a closing balance of $121,618.33, as of April 30, 2009, and a closing balance of $130,810, as of May 29,

---

[9](...continued)
that a group of clients canceled their management agreements with All State but subsequently became clients of First Beacon.

[10] According to Thomas, these escrow accounts were created and maintained "to pay property taxes, insurance escrows, payroll deductions, things of that nature." Tr. of January 5, 2012 hr'g, 19:15-16.

[11] At trial, Thomas testified to the following:

Q: So monies going into this account [of First Beacon] wouldn't have been from clients of First Beacon?
A: Well, they were either the clients or they were escrow accounts that were being maintained to pay property taxes, insurance escrows, payroll deductions, things of that nature.
Q: Were those escrow accounts, would they have been accounts that were [formerly] held in a bank account for All State?
A: When All State was managing, operating, the answer's yes, and then they eventually were transferred to First Beacon –
Q: Okay.
A: – later on. Or they would have been.

Tr. of January 5, 2012 hr'g, 19:12-22.

2009. On May 15, 2009, First Beacon's bank account had a balance of $169,238.98. Five deposits totaling $137,871.66 were made into First Beacon's bank account between May 6 and May 19, 2009.

The funds in First Beacon's bank account rapidly dwindled. It had a closing balance of $94,387.54, as of June 30, 2009, a closing balance $1,090.32, as of July 31, 2009, and a closing balance of $7,155.56, as of August 31, 2009.

Thomas initially claimed that he did not know the source of the deposits in First Beacon's bank account. He later explained that some of the funds in First Beacon's bank account had belonged to Nottingham Place Apartments, one of First Beacon's clients. Thomas acknowledged that he had an interest in Nottingham Place Apartments. He stated, however, that First Beacon returned the funds to Nottingham Place Apartments.[12]

Thomas leased an office space on First Beacon's behalf in April 2009; All State formerly had occupied the office space. He also entered into lease agreements with First Beacon on May 1, 2009, as to two Lincoln Navigators, a Mercury Mountaineer and a "Toyota SUV" for use by First Beacon's employees ("First Beacon

_____

[12] The UST referenced an affidavit by Thomas that was filed in support of his motion for summary judgment (adv. proc. docket no. 24) in the adversary proceeding commenced by the UST. Neither the UST nor the Cummings included a copy of the affidavit in the record before us. We obtained a copy of the affidavit from the bankruptcy court's electronic adversary proceeding docket. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1988); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

vehicle leases").[13]

The Cummings filed their chapter 7 petition on May 15, 2009. They filed their original schedules and statement of financial affairs ("SOFA") on June 1, 2009. They did not disclose in their original schedules their interests in First Beacon or the First Beacon vehicle leases. In fact, the Cummings did not mention First Beacon at all in the two amendments to their Schedule B filed on June 15, 2009, and June 22, 2009. They finally disclosed Thomas's interest in First Beacon in their third amended Schedule B and second amended SOFA filed on August 20, 2009. Notably, the Cummings did not ever mention Patricia's interest in First Beacon in any of the Schedule B's they filed.

The Cummings did disclose in their Schedule G, however, leases with Ford Motor Credit and Toyota Financial Services as to a 2008 Lincoln Navigator and a 2008 Toyota Highlander, respectively. The Cummings also reported in their Schedule I that they made monthly installment payments of $533.46 for a lease on a Toyota.

They later disclosed in their second amended Schedule G filed on June 15, 2009, leases with Ford Motor Credit as to two 2008 Lincoln Navigators and a 2008 Mercury Mountaineer, and a lease with Toyota Financial Services as to a 2008 Toyota Highlander. The Cummings again failed to mention the First

_____

[13] Thomas testified at trial that he did not own the vehicles. Instead he leased them from the vehicle dealerships, then "subleased" the vehicles to First Beacon for use by its employees, as he was unable to get First Beacon and/or All State to lease them directly from the vehicle dealerships.

6

Beacon vehicle leases in the second amended Schedule G.

Although Thomas had reviewed the original schedules, he stated that did not notice that they did not mention his interest in First Beacon. He assumed that the original schedules disclosed his interest in First Beacon because his attorneys at Polsinelli Shughart PC ("Polsinelli law firm"), who knew of First Beacon and in fact, had helped him prepare its operating agreement, would have "picked up on the fact that First Beacon should have been – should have been added to the schedules." Tr. of January 5, 2012 hr'g, 39:24-25, 40:1.

Thomas believed that his attorneys would include his interest in First Beacon in the original schedules so as to place the chapter 7 trustee on notice. He moreover maintained that though the original schedules failed to disclose his interest in First Beacon, it had been disclosed and discussed by his attorneys with the chapter 7 trustee before the filing of the third amended Schedule B. In fact, Thomas averred, he and his attorneys discussed First Beacon with the chapter 7 trustee at a meeting with him that took place sometime in June 2009.

In their original and in all of their amendments to Schedule B, the Cummings disclosed that the value of Thomas's interest in All State was "unknown." Thomas explained that he did so because

> [he] didn't know what it was – what [he] could get –
> [he] didn't think [he] could get anything for it, cause
> [sic] we were losing money, so – but [he] didn't know,
> so [he] just used "unknown."

Tr. of January 5, 2012 hr'g, 37:22-25. He contended that it was difficult to determine the value of his interest in All State

7

because the prospect for All State's "future revenues [was] questionable." Tr. of January 5, 2012 hr'g, 38:9-10. He explained that All State

> had no fixed assets, plus the management agreements were only 30 days. So anybody that's going to look at buying a management company would not – wouldn't do so with a 30-day contract. This would – you know, that's the nature of the business.

Tr. of January 5, 2012 hr'g, 38:4-8. Thomas further explained that though All State had funds in its bank account, those funds were earmarked for expenses, such as property taxes and insurance escrows. Moreover, All State's liabilities exceeded the funds in its bank account. The Cummings asserted the same "unknown" value for Thomas's interest in First Beacon.

Despite the fact that the Cummings had valued Thomas's interests in All State and First Beacon as "unknown," they offered to purchase them from the bankruptcy estate. In a letter dated July 21, 2009 ("offer letter"), the Cummings advised the chapter 7 trustee that All State and First Beacon

> [were] of essentially no value absent [Thomas's] ongoing involvement. All State . . . and now First Beacon Management Company, LLC, [were] management companies which provide a service and [had] no intrinsic value. The management contracts [were] by their terms, terminable by one party on thirty days' notice, which [made] the service provided even more fragile. All of those management relationships [were] based more on [Thomas] than the entity . . . .

They concluded that, based on the circumstances, the value of the bankruptcy estate's interests in All State and First Beacon "[did] not exceed $2,500."

In the Disclosure of Compensation of Attorney for Debtors ("attorney fee disclosure"), one of the Cummings' attorneys, Arturo Thompson, reported that, on May 20, 2009, All State paid

8

the Polsinelli law firm $50,000 "for the purpose of supplying the Cummings with postpetition legal services" ("law firm funds"). Thomas explained that the law firm funds represented his postpetition wages for services he performed for All State. The Cummings reported in their Declaration of Evidence of Employers' Payments within 60 Days ("employer payment declaration")(main case docket no. 16) that they had not received any payment advices, pay stubs or other evidence of payment from any employer within 60 days prepetition.

Interestingly, Thomas later testified at the one-day trial on January 5, 2012, that he had "borrowed from friends" some of the law firm funds. Tr. of January 5, 2012 hr'g, 53:7-9. He deposited these borrowed funds into All State's bank account and then "wrote the check from All State." Tr. of January 5, 2012 hr'g, 53:13-17.

Thomas initially represented that he was not drawing a salary from All State but from First Beacon in April 2009. He later claimed, however, that in May 2009, at the time he and Patricia filed for bankruptcy, he was earning $8,000 per month income as property manager for All State, "still performing some functions for All State because of the bankruptcy." Tr. of January 5, 2012 hr'g, 16:2-3.

He explained:

> There were many, many, many schedules and a lot of information that was required from All State Management. And as you can imagine I had to pay employees and I had to put in a lot of time myself, so I did get money for that from All State.

Tr. of January 5, 2012 hr'g, 16:3-7. Thomas also claimed that he was not receiving any income from First Beacon at that time.

9

The UST filed the complaint on October 22, 2009 ("UST adversary proceeding"). It sought to deny the Cummings their discharge under § 727(a)(2)(B) for concealing postpetition their interests in First Beacon and the values of their interests in All State and First Beacon by not disclosing them in their original schedules. The UST also alleged that the Cummings transferred the law firm funds with the intent to hinder, delay or defraud creditors and/or officers of the estate under § 727(a)(2)(B). It further sought to deny the Cummings their discharge under § 727(a)(4)(A) for not disclosing their interest in First Beacon and the values of their interests in All State and First Beacon in their original Schedule B.

The Cummings filed an answer to the complaint, generally denying the UST's allegations and asserting several affirmative defenses. They ultimately contended that they "did not commit any material improper act or omission and that any act or omission was timely cured."

Approximately a year before the January 5, 2012 trial in the UST adversary proceeding, the chapter 7 trustee filed a complaint against All State, First Beacon and the Cummings ("chapter 7 trustee complaint" or "chapter 7 trustee adversary proceeding") (adv. proc. no. 10-00247). He contended that First Beacon was an asset belonging to the bankruptcy estate. The chapter 7 trustee alleged that the Cummings were using All State and First Beacon to place bankruptcy estate assets beyond his reach. He therefore sought appointment of a receiver to operate First Beacon.

The chapter 7 trustee further sought a temporary restraining order and/or preliminary injunction against the Cummings to stop

10

them from transferring any accounts and/or funds belonging to All State and/or First Beacon.  He also sought to substantively consolidate the Cummings' bankruptcy case with All State's bankruptcy case to enable him to proceed with liquidating All State's assets and recovering them for the benefit of the creditors in both All State and the Cummings' bankruptcy cases.

The chapter 7 trustee and the Cummings eventually entered into a settlement agreement (main case docket no. 313).  Under the settlement agreement, the chapter 7 trustee agreed to dismiss with prejudice the chapter 7 trustee complaint against the Cummings in exchange for payments totaling $115,000 from the Cummings.  He also agreed to release his claims to All State and First Beacon.  The chapter 7 trustee further agreed not to oppose the Cummings' discharge unless he found additional undisclosed assets or determined that a disclosed asset had been materially misrepresented to him.  He and the Cummings also agreed that the settlement agreement would not bind "any person or entity who [was] not a party" to it.

Before the trial in the UST adversary proceeding, the UST and the Cummings submitted a joint pretrial statement wherein they stipulated to certain facts.  Among the undisputed facts, the Cummings conceded the following: (1) they did not disclose their interest in First Beacon in their original Schedule B and original SOFA filed on June 1, 2009, and in the second amended Schedule B filed on June 22, 2009; (2) they disclosed their interest in First Beacon in the third amended Schedule B and second amended SOFA, both filed on August 20, 2009; (3) they valued their interest in First Beacon as "unknown" in their third

11

amended Schedule B and second amended SOFA filed on August 20, 2009; (4) they disclosed Thomas's interest in All State in the original Schedule B and original SOFA, though they valued his interest as "unknown"; and (5) All State remitted the law firm funds postpetition as a retainer for legal services to be rendered to the Cummings.

The UST and the Cummings also included in the joint pretrial statement a list of exhibits they intended to present at trial. Among them, the UST submitted the entire file in the Cummings' bankruptcy case, the employer payment declaration and First Beacon's bank account statements[14] as evidence to be considered by the bankruptcy court at trial.

The UST and the Cummings also provided a list of witnesses in the joint pretrial statement. Among its witnesses, the UST had the chapter 7 trustee, Larry Warfield, testify at trial.

Thomas testified extensively. When asked why he decided to form First Beacon, Thomas explained that he did it to "start clean with a new management company," free from the "stigma of [his personal] bankruptcy" that he believed had attached to All State. Tr. of January 5, 2012 hr'g, 13:22-25.

Thomas insisted that he did not intentionally omit his interest in First Beacon from the schedules and SOFA. He further claimed that he intended neither to include false information in the schedules and SOFA nor to conceal his interest in First Beacon. He claimed that he did not intend to hide First Beacon's

_____

[14] The UST submitted bank statements for the periods ending March 31, 2009, April 30, 2009, May 29, 2009, June 29, 2009, June 30, 2009, July 31, 2009, and August 31, 2009.

12

existence; he intended for its existence to be known throughout the course of the bankruptcy. Thomas explained that he had delayed filing for bankruptcy until First Beacon was formed "so it could be part of the schedules that [the Cummings] provided to the [chapter 7 trustee] . . . . and [to] make sure everything was out in the open," because he knew First Beacon to be an asset. Tr. of January 5, 2012 hr'g, 23:17-18, 24:6-7.

Thomas also contended that he never intended to hinder or defraud creditors by authorizing the transfer of the law firm funds.

He further insisted that he never intended to hinder or defraud creditors by delaying inclusion of his interest in First Beacon in the schedules and SOFA or by valuing his interests in First Beacon and All State as "unknown." Thomas averred that he did not know the value of his interests in First Beacon and All State at the time he and Patricia filed their original schedules and SOFA.

At the end of the trial, the bankruptcy court instructed counsel for the Cummings and counsel for the UST to submit closing briefs by January 20, 2012. The bankruptcy court then informed them that it would take the matter under advisement on January 23, 2012.

A month after trial, the bankruptcy court issued its minute order, which set forth its factual findings and legal conclusions. The bankruptcy court denied the Cummings' discharge based on its factual findings and legal conclusions.

The bankruptcy court found that the Cummings knowingly and fraudulently made multiple false oaths relating to their

13

bankruptcy case under § 727(a)(4)(A), based on Thomas's testimony at trial and the information (or lack thereof) in their schedules.

It highlighted the various actions taken by Thomas and his attorneys prepetition. The bankruptcy court noted that, in an email dated April 15, 2009, to Arturo Thompson, Thomas stressed that the timing of the Cummings' bankruptcy filing "[was] critical based upon First Beacon Management [would] be officially taking over the management of various apartment communities May 1st, 2009." Two weeks later, Thomas entered into a management agreement with First Beacon, leased several of his vehicles to First Beacon and opened a new bank account on its behalf. The bankruptcy court therefore concluded that the Cummings' omission of First Beacon from their original Schedule B and SOFA was not "an innocent mistake," given the great and hurried lengths Thomas and his attorneys took prepetition to form First Beacon to facilitate the Cummings' "post-bankruptcy fresh start."

The bankruptcy court further determined that Thomas's testimony lacked credibility. For example, with respect to the law firm funds, Thomas testified at trial that they represented future earnings for his services to All State. But the bankruptcy court pointed out that he never disclosed that the law firm funds represented future income, even though § 521(a)(1)(vi) required the Cummings to disclose "'any reasonably anticipated increase in income' for the year after they filed for bankruptcy."

The bankruptcy court also noted the Cummings' omission of

14

the First Beacon leases from their schedules. The Cummings claimed in their original schedules that they owned no vehicles, even though they had leased them to First Beacon in May 2009.

In addition, the bankruptcy court found suspect the low August 2009 closing balance of First Beacon's bank account. It pointed out that from April 2009 to June 2009, First Beacon's bank account had more than $100,000; by August 2009, however, First Beacon's bank account held but a few thousand dollars. The bankruptcy court believed that the Cummings had a prepetition interest in the funds in First Beacon's bank account but did not disclose their interest in the funds in their schedules.

On February 29, 2012, the bankruptcy court entered an order denying the Cummings their chapter 7 discharge. The Cummings timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(J). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Did the bankruptcy court err in denying the Cummings their chapter 7 discharge?

## STANDARD OF REVIEW

We review the bankruptcy court's factual findings for clear error and its legal conclusions de novo. See Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010). We review de novo mixed questions of fact and law, where the historical facts are established, the legal rules are undisputed, and the issue is whether the facts satisfy the legal rule. See id.

15

A bankruptcy court's fact determination is clearly erroneous if it is illogical, implausible or without support in the record. Id. (citing United States v. Hinkson, 585 F.3d 1247, 1261-62 & n.21 (9th Cir. 2009)(en banc)). If the bankruptcy court's "account of the evidence is plausible in light of the record viewed in its entirety," we may not reverse it, "even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574.

We give great deference to the bankruptcy court's determinations regarding the credibility of witnesses because the bankruptcy court, as the trier of fact, had the opportunity to note "variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Id. at 575 (internal quotation marks omitted).

We may affirm on any ground supported by the record. Shanks, 540 F.3d at 1086.

**DISCUSSION**

The Cummings raise two main arguments on appeal: (1) the bankruptcy court improperly considered and based its ruling on allegations not presented in the complaint as grounds for the denial of their discharge, and (2) the UST failed to prove elements under § 727(a)(4)(A). Before we address their arguments, we first need to outline the general principles that guide our review of denials of chapter 7 discharges.

"In keeping with the 'fresh start' purposes behind the

16

Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010). We are mindful, however, that the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning [provided by the discharge] to the honest but unfortunate debtor." In re Boyajian, 564 F.3d 1088, 1092 (9th Cir. 2009)(quoting Grogan v. Garner, 498 U.S. 279, 286-87 (1991)(quotation marks omitted)).

The party objecting to the debtor's discharge must prove, by a preponderance of the evidence, that the debtor's actions or conduct falls within one of the exceptions to discharge under § 727.  See Grogan v. Garner, 498 U.S. at 287 (establishing preponderance of evidence standard for parties objecting to discharge under § 523).  The objecting party therefore must show that the debtor acted with "actual, rather than constructive, intent."  Retz, 608 F.3d at 1196 (quoting Khalil v. Developers Surety & Indem. Co. (In re Khalil), 379 B.R. 163, 172 (9th Cir. BAP 2007)(quotation marks omitted)).

A.   The bankruptcy court properly considered the UST's allegations and properly applied the burden of proof[15]

---

[15] The Cummings also contend that the bankruptcy court erred in basing the denial of their discharge under § 727(a)(2)(A) and (B), in part, on the assumption that they had taken funds out of First Beacon's bank account.  They argue that there is no evidence in the record indicating that the funds belonged to them and that they had withdrawn and transferred the funds out of First Beacon's bank account.
Reviewing the record before us, we agree that there is no evidence showing that they owned any of the funds in First Beacon's bank account or that they withdrew and transferred funds
(continued...)

17

### 1.   Factual allegations

The Cummings complain that the bankruptcy court considered allegations not presented by the UST in the complaint as grounds for denial of their discharge under § 727(a)(4)(A).  They target the bankruptcy court's reliance on their non-disclosures of: (1) the law firm funds as Thomas's postpetition wages to be earned as All State's property manager, and (2) the First Beacon vehicle leases, as support for its ruling.  The Cummings contend that they did not have a sufficient opportunity to address these allegations at trial because they were not set forth in the complaint.

As the UST points out, however, the Cummings had agreed in the joint pretrial statement to allow the UST to submit the employer payment declaration, as well as the entire file in their bankruptcy case, as evidence at trial.  The bankruptcy court was entitled to consider any evidence presented to it at trial and to base its decision on any grounds within the claims alleged, supported by the evidence.  See Tevis v. Wilke, Fleury, Hoffelt, Gould & Birney, LLP (In re Tevis), 347 B.R. 679, 695 (9th Cir. BAP 2006)("It is the bankruptcy court's responsibility to evaluate the evidence presented . . . . [for] [it] has an obligation to consider all of the evidence properly presented,

---

[15](...continued)
out of it.  The only evidence pertaining to First Beacon's bank account consists of the bank statements submitted by the UST. The bank statements simply list the dates and amounts of various deposits and withdrawals, various check numbers and balance amounts.  The bank statements do not identify any person who owns, deposits or withdraws the funds.  However, as noted in fn. 4 supra, we need not examine the bankruptcy court's determinations under § 727(a)(2)(A) and (B).

18

and to give it the weight that it deserves."). The bankruptcy court therefore did not err in considering and relying on these documents in making its ruling because the Cummings explicitly agreed to allow them to be submitted into evidence.

The Cummings argue that had they known that the omission of the First Beacon vehicle leases from their schedules would be at issue at trial, they would have directed the bankruptcy court to consider their amended Schedule G. The Cummings claim that the amended Schedule G "identified each of the contracts applicable to these vehicles as an unexpired lease."

But, as the UST points out, the Cummings did not disclose the First Beacon vehicle leases in their original or amended Schedule G. Rather, they listed their own leases with the various vehicle dealerships; they made no reference to First Beacon at all in their original or amended Schedule G. The Cummings only disclosed the First Beacon vehicle leases through Thomas's testimony at trial.

    2.   Burden of proof

The Cummings claim that the bankruptcy court shifted the burden of proof to them, instead of the UST. Instead of basing the denial of the Cummings' discharge on evidence provided by the UST, the bankruptcy court interpreted the uncontested facts as "a calculated fraud [i.e., actual fraudulent intent]" rather than as "an innocent collection of circumstances." Appellants' Opening Brief at 17. The bankruptcy court also based its ruling, in large part, on Thomas's testimony at trial, which it found unconvincing.

    "Proof by the preponderance of the evidence means that it is

19

sufficient to persuade the finder of fact that the proposition is more likely true than not." United States v. Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 654 (9th Cir. BAP 1994), aff'd 85 F.3d 1415 (9th Cir. 1996), cert. denied sub nom., Arnold & Baker Farms v. United States, 519 U.S. 1054 (1997). Here, the UST had the burden of presenting evidence sufficient to show that the Cummings knowingly and fraudulently made false oaths as to material facts relating to their case under § 727(a)(4)(A).

The bankruptcy court did not shift the burden of proof to the Cummings by considering the circumstantial evidence of the undisputed facts and the conflicting (and often contradictory) testimony of Thomas in making its determination. The Cummings themselves agreed to the undisputed facts in the joint pretrial statement. Thomas also willingly proffered his testimony to counter the UST's allegations; the bankruptcy court simply found his testimony not credible. More important, there is ample evidence to support the bankruptcy court's findings under § 727(a)(4)(A).

B. The bankruptcy court did not err in denying the Cummings' discharge under Section 727(a)(4)(A)

Under § 727(a)(4)(A), the bankruptcy court shall grant a discharge to the debtor unless he or she "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." "A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." Retz, 606 F.3d at 1196 (quoting Khalil, 379 B.R. at 172, aff'd, 578 F.3d 1167, 1168 (9th Cir.

20

2009)(expressly adopting BAP's statement of applicable law) (quotation marks omitted)).  A false oath may involve either "an affirmatively false statement or an omission from the debtor's schedules."  Searles v. Riley (In re Searles), 317 B.R. 368, 377 (9th Cir. BAP 2004)(citations omitted).  "A false oath is complete when made.  The fact of prompt correction of an inaccuracy or omission may be evidence probative of lack of fraudulent intent."  Id.  The purpose of § 727(a)(4)(A) is to make sure "that the trustee and creditors have accurate information without having to conduct costly investigation."  Id. (quoting Khalil, 606 F.3d at 1196)(quotation marks omitted)).

To prevail on a § 727(a)(4)(A) claim, the plaintiff must show that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently."  Id. at 1197 (quoting Roberts v. Erhard (In re Roberts), 331 B.R. 876, 882 (9th Cir. BAP 2005)(quotation marks omitted)).

1.  False oath

The Cummings contend that their delayed disclosure of Thomas's interest in First Beacon does not constitute a false oath under § 727(a)(4)(A).  They acknowledge that they did omit Thomas's interest in First Beacon in their original and second amended Schedule B.  The Cummings claim, however, that they believed that it had been included in the original and second amended Schedule B at the time of filing.

As the UST points out, whether the Cummings knew about the omission concerns the third element under § 727(a)(4)(A).  The fact that the Cummings omitted this information from their

21

schedules is enough to satisfy the first element. See Searles, 317 B.R. at 377 ("A false oath is complete when made.").

Moreover, this is not the only omission the Cummings made in their schedules. Although the Cummings eventually disclosed Thomas's interest in First Beacon, they did not disclose Patricia's interest in it; in every iteration of their Schedule B, they maintained that only Thomas had an ownership interest in First Beacon.[16] They also did not disclose the First Beacon vehicle leases; they simply listed their own leases with the various vehicle dealerships. The Cummings further did not disclose that the law firm funds transfer purportedly represented Thomas's postpetition wages as property manager for All State. Item number 17 on Schedule I requires the debtor to "[d]escribe any increase or decrease in income reasonably anticipated to occur within the year following the filing of this document . . . ." The Cummings left item number 17 blank in their Schedule I. They never filed an amended Schedule I in their bankruptcy case.

The Cummings also made false statements in their schedules. They maintained in every iteration of their Schedule B that Thomas's interests in First Beacon and All State had "unknown" values. Thomas even testified that he had characterized the value of his interest in All State as "unknown" because he

---

[16] The instructions on Schedule B state that if "the debtor is married, state whether husband, wife, both or the marital community own the property by placing an 'H,' 'W,' 'J,' or 'C' in the column labeled 'Husband, Wife, Joint or Community.'" The Cummings consistently listed "H" in the original and the amendments to Schedule B.

22

"didn't think [he] could get anything for it" and that it was difficult to determine the value of his interest in All State because the prospect of its "future revenues was questionable." But in the offer letter, the Cummings claimed that Thomas's interests in First Beacon and All State "did not exceed $2,500," and they ultimately settled with the chapter 7 trustee for $115,000. Despite his assertions to the contrary, Thomas was able to determine that his interests in All State and First Beacon had at least some value.

    2.    Material fact

    "A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." Retz, 606 F.3d at 1198 (quoting Khalil, 379 B.R. at 173). A false statement or omission may be material even if creditors do not suffer direct financial prejudice from it. Fogel Legware of Switzerland, Inc. v. Wills (In re Wills), 243 B.R. 58, 63 (9th Cir. 1999). An omission or misstatement is material if it "detrimentally affects administration of the estate." Id. (quoting Wills, 243 B.R. at 63 (quotation marks omitted)). More specifically, if the omission or misstatement "adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition," then the omission or misstatement may be considered material. Wills, 243 B.R. at 63 (quoting 6 King, Collier on Bankruptcy ¶ 727.04[1][b]).

    The Cummings contend that the omission of their interest in

23

First Beacon from their schedules did not materially harm the administration of their bankruptcy estate, especially as they quickly amended their schedules to correct the omission. Moreover, they believe that even if they had disclosed their interest in First Beacon in their original Schedule B, "nothing would have happened differently in the administration of [their bankruptcy] estate." The chapter 7 trustee still would have entered into the settlement agreement with the Cummings, they assert, as it provided a benefit to the bankruptcy estate.

Contrary to their assertions, the Cummings' omissions and misstatements did adversely affect the chapter 7 trustee's administration of the bankruptcy estate. At trial, the chapter 7 trustee testified that the Cummings' omissions and subsequent amendments to their schedules created a "cat and mouse game, or [the game of] go fish." Tr. of January 5, 2012 hr'g, 57:22-23. The chapter 7 trustee explained that

> [E]very time we would discover an asset that [the Cummings] failed to list, they would amend the schedules again. And when they did the amendment they didn't do just the amendment as relates to that one issue, they would then fully amend their schedules, which caused us to have to go through the comparison of what was on the original, what was on the amended. And then when it was amended again we'd have to go do that again.

Tr. of January 5, 2012 hr'g, 57:8-15.

The chapter 7 trustee also testified that the Cummings' omission of Thomas's interest in First Beacon and the value of his interest raised concerns for him; namely "whether or not First Beacon was going to be a bust out for All State. . . . [b]ecause there was no reference to First Beacon on the petitions and schedules." Tr. of January 5, 2012 hr'g, 61:4-6. He stated

24

that he faced difficulties in trying to "get an understanding of what was going on;" he explained that he was "constantly being bombarded with walls being placed up for knowledge [he was] trying to gain." Tr. of January 5, 2012 hr'g, 64:8-11. Despite his efforts, the chapter 7 trustee was unable to make any determination to his satisfaction as to the value of First Beacon.

The Cummings contend that "nothing different" would have happened in the administration of their bankruptcy case, even if they had disclosed Thomas's interest in First Beacon and the value of his interests in First Beacon and All State. They further claim that the settlement agreement actually provided a benefit to the bankruptcy estate by adding to the funds available for distribution to creditors.

The Cummings' characterization of the settlement agreement is disingenuous. Had they fully disclosed their interest in First Beacon and the value of their interests in All State and First Beacon, the chapter 7 trustee would not have had to initiate the adversary proceeding. The chapter 7 trustee had initiated the adversary proceeding against the Cummings, All State and First Beacon, in part, to help him proceed with liquidation of All State's assets, if any, and recovery of the same for the benefit of creditors.

The chapter 7 trustee also characterized the settlement agreement as a "surrender." He explained that he entered into the settlement agreement with the Cummings mainly because he would never realize enough funds to satisfy even the administrative claims as he was "just getting eaten alive with

25

attorney's fees."  Tr. of January 5, 2012 hr'g, 66:13-14.

Based on the chapter 7 trustee's testimony, the Cummings' omissions and misstatements indeed adversely affected the administration of their bankruptcy estate.  We therefore conclude that the bankruptcy court did not err in determining that the Cummings' omissions and misstatements concerned material facts within the meaning of § 727(a)(4)(A).

3.  Knowingly made

A debtor "acts knowingly if he or she acts deliberately and consciously."  Retz, 606 F.3d at 1198 (quoting Khalil, 379 B.R. at 173)(quotation marks omitted)).  The Cummings assert that they did not deliberately and consciously omit from their schedules their interests in First Beacon and the value of their interests in First Beacon and All State.  They raise the same defense for their misstatements concerning the law firm funds.

The Cummings would like us to believe that they had overlooked these omissions and misstatements when they filed their schedules.  We discern no error in the bankruptcy court's conclusion that these omissions and misstatements did not result from "an innocent mistake."  At trial, Thomas testified that he had reviewed the original schedules.  He also had signed the original schedules under penalty of perjury, attesting that he had reviewed them and that they were true and correct.  Given the flurry of activity that took place prepetition around First Beacon, we agree with the bankruptcy court that First Beacon would be "clearly and consistently on their minds."

We also find no error in the bankruptcy court's conclusion that the Cummings deliberately and consciously misstated their

26

income in their Schedule I. Thomas offered contradictory testimony as to the source of the law firm funds. He first testified at trial that the law firm funds represented his postpetition wages for his services as All State's property manager. Thomas later testified that he had obtained loans from friends to put together some of the law firm funds. Notably, though the Cummings amended their Schedule B numerous times, they did not amend their Schedule I to include this information. Based on the record before us, we conclude that the bankruptcy court did not err in finding that the Cummings knowingly made false oaths in connection with their bankruptcy case.

    4.    Fraudulent intent

    To establish fraudulent intent, the UST must prove that the Cummings: (1) made omissions or misstatements in their schedules; (2) that they knew were false at the time they made them; and (3) made them with the intention and purpose of deceiving their creditors. Retz, 606 F.3d at 1199 (quoting Khalil, 379 B.R. at 173 (quotation marks omitted)). "Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct." Id. (citing Devers v. Bank of Sheridan, Mont. (In re Devers), 759 F.2d 751, 753-54 (9th Cir. 1985)). Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but are not enough alone to constitute fraudulent intent. Id. (citing Khalil, 379 B.R. at 173-75).

    The Cummings cite their prompt notification of the formation of First Beacon to their attorneys as proof that they did not intend to conceal Thomas's interest in First Beacon. They also claim that they furnished the chapter 7 trustee with copies of

27

First Beacon's lease agreement concerning the office space. They contend that they took these actions all before they filed their third amended Schedule B. When the Cummings realized their omission, they "promptly" filed amendments to their schedules.

It took the Cummings until August 2009 and two amendments in the meantime to "rectify" their omissions in their Schedule B. Even then, they still did not list Patricia's interest in First Beacon in the second amended Schedule B and the following amendments to Schedule B. We do not consider three months as necessarily a short period of time in which to file amendments to schedules to correct material non-disclosures. If the Cummings realized that they omitted from their schedules their interest in First Beacon, it should not have taken them three months to "rectify" their mistake. Of course, the omission of Patricia's interest in First Beacon never was rectified.

Even more telling as to the Cummings' fraudulent intent is Thomas's contradictory testimony regarding the source of the law firm funds. The Cummings did not amend their Schedule I to reflect the increase in their income from the alleged postpetition wage advance. They did not mention the First Beacon vehicle leases in their Schedule G, even though they entered into the leases two weeks before they filed for bankruptcy protection. The Cummings ultimately disclosed that they had directly leased the vehicles from the vehicle dealerships, but they never mentioned that they leased those same vehicles to First Beacon, as Thomas later testified at trial.

Given these circumstances, we conclude that the bankruptcy court's finding as to the Cummings' fraudulent intent was not

illogical, implausible or unsupported by the record. We therefore conclude that the bankruptcy court did not err in denying the Cummings' discharge under § 727(a)(4)(A).

## CONCLUSION

Based on our review of the record, we conclude that sufficient evidence exists to support the bankruptcy court's determination under § 727(a)(4)(a). The bankruptcy court thus did not err in denying the Cummings' discharge. We therefore AFFIRM.