**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>SAJID A. RAVASIA and DEBRA J.<br>RAVASIA,<br><div align="center">Debtors.</div> | BAP No.  EW-20-1212-BTL<br><br>Bk. No.    2:17-bk-00106-FPC<br><br>Adv. No.   2:17-ap-80021-FPC |
| SAJID A. RAVASIA; DEBRA J. RAVASIA,<br><div align="center">Appellants,</div><br>v.<br>UNITED STATES TRUSTEE,<br><div align="center">Appellee.</div> | MEMORANDUM[1] |

<div align="center">

Appeal from the United States Bankruptcy Court
for the Eastern District of Washington
Frederick P. Corbit, Bankruptcy Judge, Presiding

Before: BRAND, TAYLOR, and LAFFERTY, Bankruptcy Judges.

</div>

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

## INTRODUCTION

Chapter 7[2] debtors Dr. Sajid Ravasia and Dr. Debra Ravasia[3] appeal an order denying their discharge under § 727(a)(4)(A) for false oaths. The Ravasias also appeal a prior order granting the U.S. Trustee ("UST") leave to file an amended complaint. We AFFIRM.

## FACTS

### A.    The bankruptcy filing and the § 727 complaint

The Ravasias are both physicians. Mr. Ravasia is a psychiatrist and at all times relevant was employed by a private health care provider. Mrs. Ravasia is an obstetrician/gynecologist.

The Ravasias filed a joint chapter 7 bankruptcy case on January 19, 2017, after closing a medical clinic they owned and operated. Their debts were primarily business debts. In their schedules and statement of financial affairs signed under penalty of perjury, the Ravasias represented: (1) Mr. Ravasia's estimated monthly gross wages were $26,818.05, and his estimated monthly overtime pay was $0; (2) Mrs. Ravasia was unemployed with estimated monthly gross wages of $0, but an increase in income was expected

---

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[3] Because the Ravasias are both physicians, we refer to them individually as Mr. Ravasia and Mrs. Ravasia to avoid any confusion. No disrespect is intended.

because she was looking for work; (3) their estimated monthly expenses were $26,805.06, with no indication if any increase or decrease was expected; and (4) there was a "possible tax refund" for 2016 in an "unknown amount" and its value was $0.

At the § 341(a) meeting of creditors, the Ravasias confirmed under oath that they reviewed their bankruptcy petition, schedules, and statement of financial affairs before signing them and that the information contained therein was "truthful and accurate." Mrs. Ravasia testified that, following the closure of their clinic, she was "not terribly employable" as an OB-GYN. To become gainfully employed in that area of practice, she was leaving for seven weeks to do volunteer work in Afghanistan to get recent experience delivering babies. Mrs. Ravasia testified that she was also inquiring about locum tenens (temporary) work in Canada, but there was "nothing really on the horizon" for paid employment, and if she did obtain such work, it would be sporadic and part-time and she could not estimate what the compensation would be.

After two extensions, the chapter 7 trustee filed a timely complaint to deny the Ravasias' discharge. He alleged that the Ravasias knowingly and fraudulently made materially false statements or accounts in their bankruptcy case under § 727(a)(4)(A), including failing to disclose payments made to creditors within 90 days prior to filing bankruptcy and failing to disclose certain prepetition cash withdrawals. Ultimately, the chapter 7 trustee

reached a settlement with the Ravasias, but the UST objected to the portion of the proposed settlement to dismiss the § 727 complaint. The bankruptcy court agreed with the UST and entered an order that preserved the monetary settlement but allowed the § 727 action to proceed with the UST substituted as plaintiff.

Upon completing her volunteer work in Afghanistan in May 2017, Mrs. Ravasia found steady locum work in Canada and the United States for the remainder of the year. For her various locum positions, Mrs. Ravasia grossed $260,462 in 2017. Mr. Ravasia grossed $668,000 in 2017, or about $55,000 per month.[4]

Nearly two years after the § 727 complaint had been filed, the Ravasias filed Amended Schedules I and J. On the Amended Schedule I, the Ravasias represented that Mr. Ravasia's gross monthly wages were $20,630.40, about $6,000 less than originally reported, and that Mrs. Ravasia's income was $0. To explain the $6,000 decrease in Mr. Ravasia's income, the Ravasias represented that, with Mrs. Ravasia leaving the country for an indefinite period of time for employment, Mr. Ravasia would become a solo parent and

---

[4] Mr. Ravasia's W-2's and tax statements for 2013 through 2016 revealed his gross annual wages as follows:

2013:  $575,641
2014:  $569,946
2015:  $530,503.99
2016:  $481,268

unable to do his usual extra shift work, if that was still an option given his employer's plan to hire additional psychiatrists. Therefore, Mr. Ravasia expected to earn only his base salary of $250,000 per year.

On the Amended Schedule J, the Ravasias represented that their estimated monthly expenses were $90,955.76, about $64,000 more than originally reported. This figure included more unreported business expenses and student loan payments for their children.

## B.    Bankruptcy court grants the UST leave to amend the § 727 complaint

Two years after the § 727 complaint was filed, the UST sought leave to amend. The amended complaint asserted the same claim for relief under § 727(a)(4)(A), but alleged that the Ravasias made additional false oaths by understating their expected income and expenses for 2017. For example, Schedule I listed Mr. Ravasia's expected gross income at $27,000 per month, but his gross monthly income for 2016 was $40,000, and his gross monthly income for 2017 was $55,000. Further, Schedule J understated the Ravasias' expected living expenses on non-essentials such as foreign travel, private school and college tuition for their children, frequent spa visits, and extensive dining out.

The UST alleged that the Ravasias knowingly and fraudulently made these (and other) misrepresentations about their financial situation at the time of their filing to mislead the court and creditors about their ability to repay their debts. The UST alleged that had it known the truth about the Ravasias'

financial condition, a conversion to chapter 11 would likely have been pursued and granted.

Over the Ravasias' objection, the bankruptcy court granted the UST's motion for leave to amend the § 727 complaint. The Ravasias' appeal of that interlocutory order to the district court was denied.

## C. The § 727 trial and the bankruptcy court's decision

After a three-day trial, the bankruptcy court entered its order denying the Ravasias' discharge under § 727(a)(4)(A), finding that they made multiple false oaths on their schedules with respect to their income and expenses.

Schedule I and Amended Schedule I both indicated Mr. Ravasia's income was substantially less than what he earned in each of the several years before and after he filed for bankruptcy. The Ravasias also failed to indicate that his income could increase, and in fact had increased substantially, within the year of filing. The court found that Mr. Ravasia's reduced income in January 2017 – the month the Ravasias filed for bankruptcy – was not a representative month for his income, and the use of that month, especially without consideration of his substantial annual July bonus and their failure to amend the schedules to reflect that known bonus, was fraudulent. The court found that the Ravasias' repeated misrepresentations and omissions about Mr. Ravasia's income were materially false. It further found that it was evident to the Ravasias that Mr. Ravasia's income on Schedule I was substantially underreported, and thus

6

their false oaths related to his income were made knowingly, deliberately, and consciously. Finally, the court found that the Ravasias acted with intent to deceive interested parties about Mr. Ravasia's income given their failure to update their schedules with accurate income information for him and the Amended Schedule I continuing to dramatically underreport it.

While the court did not find the initial reported income for Mrs. Ravasia as $0 materially false, it did find her testimony that she was not employable and that her income was uncertain "not credible." The court found that the Ravasias' failure to amend the schedules with accurate income information for Mrs. Ravasia, and failure to disclose her substantial income in the Amended Schedule I, established that their false oaths about her income were made knowingly and fraudulently and that they had acted with intent to deceive interested parties about her income.

The court also found that the Ravasias made false oaths about their expenses. The evidence established that the Ravasias' combined net income for 2017 was approximately $550,000, and that they spent substantially all of this income, or an average of $45,000 per month, as compared to the $26,000 they reported on Schedule J. The Ravasias acknowledged the underestimated expenses in Schedule J as inaccurate. The court found that the Ravasias' misrepresentation of their expected ongoing expenses was a material fact, made knowingly, deliberately, and consciously. The court found that the

Ravasias knowingly and fraudulently provided false information about their expenses and failed to amend their schedules with accurate information.

In summary, the court found that, in what might have been an attempt to prevent conversion of the case to chapter 11, the Ravasias adopted a zealous position regarding their financial reporting. However, their zealous actions amounted to fraud. The Ravasias timely appealed.

## JURSIDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(J). We have jurisdiction under 28 U.S.C. § 158.[5]

## ISSUES

1.      Did the bankruptcy court err in granting the UST leave to amend the § 727 complaint?

2.      Did the bankruptcy court err in denying the Ravasias' discharge under § 727(a)(4)(A)?

## STANDARDS OF REVIEW

We review de novo whether an amended complaint relates back to the original pleading. *Alfaro v. Johnson*, 862 F.3d 1176, 1179 (9th Cir. 2017); *Magno v. Rigsby (In re Magno)*, 216 B.R. 34, 37-38 (9th Cir. BAP 1997). We review for

---

[5] The order granting leave to amend the § 727 complaint was an interlocutory order that merged into the final order denying discharge. Therefore, we have jurisdiction to review that earlier, non-final order. *See Harvey v. Waldron*, 210 F.3d 1008, 1012 (9th Cir. 2000), *overruled in part on other grounds by Wallace v. Kato*, 549 U.S. 384, 393-94 (2007).

abuse of discretion the bankruptcy court's decision to allow or deny amendment of pleadings under Civil Rule 15(c) and Rule 7015. *In re Magno*, 216 B.R. at 38; *First Fed. Sav. Bank v. Gunn (In re Gunn)*, 111 B.R. 291, 292 (9th Cir. BAP 1990). Whether cause exists to extend the filing deadline to object to a debtor's discharge is reviewed for abuse of discretion. *McDermott v. St. George (In re St. George)*, Nos. 16-8017/8018, 2017 WL 1379321, at *1 (6th Cir. BAP Apr. 17, 2017); *Rupp v. Auld (In re Auld)*, 561 B.R. 512, 515-16 (10th Cir. BAP 2017). A trial court abuses its discretion if it applies the wrong legal standard or if its factual findings were clearly erroneous. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

In an action for denial of discharge under § 727, we review: (1) the bankruptcy court's legal conclusions de novo, (2) factual findings for clear error, and (3) mixed questions of law and fact de novo. *Searles v. Riley (In re Searles)*, 317 B.R. 368, 373 (9th Cir. BAP 2004), *aff'd*, 212 F. App'x 589 (9th Cir. 2006) (citing *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 791-92 (9th Cir. 1997) (en banc)). Under § 727(a)(4)(A), whether a debtor made a false oath, whether the false statements were material, and whether the debtor had the requisite fraudulent intent are all questions of fact reviewed under the clearly erroneous standard. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1197 (9th Cir. 2010). Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Id.* at 1196.

9

We may affirm on any ground supported by the record, regardless of whether the bankruptcy court relied upon, rejected or even considered that ground. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).

<div align="center">

**DISCUSSION**

</div>

**A.      The bankruptcy court did not err in granting the UST leave to amend the § 727 complaint.**

"The court should freely give leave [to amend] when justice so requires." Civil Rule 15(a); *see also* Rule 7015. The Ninth Circuit applies this rule with "extreme liberality." *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (citations omitted). In discharge cases, the opportunity to amend is especially important because of the short time frame under which such a complaint must be filed. *In re Gunn*, 111 B.R. at 293; *Mission Viejo Nat'l Bank v. Englander (In re Englander)*, 92 B.R. 425, 428 (9th Cir. BAP 1988); Rule 4004(a).

Under Civil Rule 15(c)(1), made applicable here by Rule 7015, an amendment to a pleading relates back to the date of the original pleading when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading[.]" Civil Rule 15(c)(1)(B); *see also* Rule 7015. This link will be found when the claim to be added is likely to be proven by the same kind of evidence that would be used to support the original pleading. *In re Magno*, 216 B.R. at 39;

*see also Dominguez v. Miller (In re Dominguez)*, 51 F.3d 1502, 1510 (9th Cir. 1995). "The focus of the inquiry is on the factual allegations made in the two complaints so as to give the opposing party fair notice of the claims against him." *In re Magno*, 216 B.R. at 39-40 (holding that amended complaint alleging § 523(a)(6) claim did not relate back to original complaint for denial of debtor's discharge under § 727(a)(2)(A) and (a)(4)(A), because mere mention of a $120,040 claim in the original complaint was not enough to put debtor on notice of a § 523(a)(6) claim and original complaint did not allege any facts which would have proven the required elements of a § 523(a)(6) claim).

In applying the relation back doctrine in the context of objections to discharge and the dischargeability of certain debts, we have held:

> The basic test is whether the evidence with respect to the second set of allegations could have been introduced under the original complaint, liberally construed; or as a corollary, that in terms of notice, one may fairly perceive some identification or relationship between what was pleaded in the original and amended complaints.

*Gelling v. Dean (In re Dean)*, 11 B.R. 542, 545 (9th Cir. BAP 1981), *aff'd*, 687 F.2d 307 (9th Cir. 1982) (internal citations omitted); *see also In re Gunn*, 111 B.R. at 292-94 (allowing amendment of original complaint under § 523(a)(2)(A) and (B) and § 727(a)(5) that added claims under § 727(a)(3) and (4), because "[t]he objection to discharge and dischargeability claims of the original complaint

11

would certainly have put the debtor on notice of the two related theories of the amended complaint.").

It is undisputed that the UST's motion for leave to amend the § 727 complaint was filed after the deadline expired for filing such a complaint by two years. *See* Rule 4004(a).[6] The Ravasias argue that the bankruptcy court erred by granting leave to amend because the allegations of false oaths as to income and expenses were new, did not relate back to the original complaint, and were therefore time barred. The Ravasias have not cited a case where a court denied leave to amend a complaint alleging a claim for false oath under § 727(a)(4)(A), when that same claim was alleged in the original complaint but the amended complaint asserted additional false oaths learned in discovery.

We conclude that the amended complaint related back to the original complaint. Both complaints challenged the veracity of the representations the Ravasias made in connection with their bankruptcy case, particularly those made in their schedules and statement of financial affairs. For example, the original complaint alleged that the Ravasias failed to disclose certain credit card debts owed and that those debts were paid shortly before their chapter 7 filing. The amended complaint alleged that the Ravasias made false oaths

---

[6] Rule 4004(a) provides, in relevant part, that "[i]n a chapter 7 case, a complaint . . . objecting to the debtor's discharge shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a)."

with respect to their income and expenses including, among other things, these same, undisclosed credit card expenditures. Hence, the Ravasias were on notice that they might have to defend false oath claims, and the evidence of their income and expenses could have been introduced under the original complaint, liberally construed. *In re Dean*, 11 B.R. at 545. Further, the original complaint alleged facts which would have proven the required elements for a claim under § 727(a)(4)(A). *In re Magno*, 216 B.R. at 39-40.

This case is strikingly similar to *Kennicott Brothers Co. v. Fidanovski (In re Fidanovski)*, 347 B.R. 343 (Bank. N.D. Ill. 2006). There, the creditor sought leave to amend after filing an original complaint under § 727(a)(4)(A) that listed a single example of a false oath committed by the debtors in their statement of financial affairs. The amended complaint, filed after discovery, set forth "an immense list (some 31 paragraphs, in all) of instances in which [the debtors] committed false oaths either in their schedules and statement of financial affairs or at the [§] 341 meeting." *Id.* at 346. The court concluded that, while the creditor's new claim under § 727(a)(3) did not relate back to the original complaint, the § 727(a)(4)(A) claim did. *Id.* at 347-48. Specifically, the court found that the amendment consisting of additional facts supporting the existing § 727(a)(4)(A) claim related back since the new allegations concerned

the same "core of facts" alleged in the original complaint. Thus, the amendment to add these facts was timely. *Id.*[7]

We also conclude that the amendments to the § 727 complaint were permissible under Rule 4004(b)(2),[8] which provides for the addition of objection to discharge claims after the time for objection has expired but before discharge is granted when: (A) the objection is based on facts that, if learned after the discharge, would provide a basis for revocation under § 727(d); and (B) the movant did not have knowledge of those facts in time to permit an objection. *See Heartwood 4, LLC v. Tabor (In re Tabor)*, Adv. No. 15-01616-EPK, 2016 WL 3598643 (Bankr. S.D. Fla. June 24, 2016); *Link v. Mauz (In re Mauz)*, 513 B.R. 273 (Bankr. M.D. Pa. 2014) (considering propriety of motion for leave to amend objection to discharge complaint under both Civil Rule 15(c)(1)(B) and Rule 4004(b)(2)). Section 727(d)(1) provides for revocation of

---

[7] The court in *Fidanovski* ultimately denied leave to amend on the grounds of futility, because it determined that the amendment was unnecessary pursuant to Civil Rule 8. 347 B.R. at 348. The court found that the original complaint "gave perfectly adequate notice of its [§] 727(a)(4)(A) claim," *id.* at 348, and that "[a]dding 31 more paragraphs of 'false oaths' to the complaint . . . serve[d] no purpose." *Id.* at 349.

[8] Rule 4004(b)(2) provides:

A motion to extend the time to object to discharge may be filed after the time for objection has expired and before discharge is granted if (A) the objection is based on facts that, if learned after the discharge, would provide a basis for revocation under § 727(d) of the Code, and (B) the movant did not have knowledge of those facts in time to permit an objection. The motion shall be filed promptly after the movant discovers the facts on which the objection is based.

discharge when it is shown that the debtor obtained a discharge through fraud and the plaintiff was not aware of the fraud until after the discharge was entered.

Thus, under Rule 4004(b)(2) as relevant to the motion to amend, the UST had to show the amended complaint alleged that the Ravasias committed an act of fraud that would provide a basis for revocation of discharge under § 727(d)(1), that the UST did not know of the act in time to permit an objection to discharge prior to the expiration of the Rule 4004(a) deadline, and that the UST filed the motion to amend promptly upon discovering the facts on which the objection was based. *In re Tabor*, 2016 WL 3598643, at *8.

All three elements were met here. In the amended § 727 complaint, the UST alleged that the Ravasias made multiple false oaths about their income and expenses in their schedules and at the § 341(a) meeting in violation of § 727(a)(4)(A). Those facts, if learned after entry of the discharge, would constitute fraud that would support revocation of discharge under § 727(d)(1). *Jones v. U.S. Tr.*, 736 F.3d 897, 900 (9th Cir. 2013) (material false oath which would have resulted in denial of discharge had it been known at the time can justify subsequent revocation of discharge under § 727(d)(1)) (citing cases). In the motion to amend, the UST asserted that the extent of the Ravasias' false oaths about their income and expenses was not learned until the parties had engaged in formal discovery, which was not until early-mid

15

2019 – long after the deadline had run under Rule 4004(a) – and the delay in discovery was due, in some part, to the Ravasias. The Ravasias filed their Amended Schedules I and J on May 28, 2019, wherein they made further misrepresentations about their income and expenses. The UST promptly filed its motion to amend the § 727 complaint on June 4, 2019, to include these additional facts learned in discovery.

Accordingly, because the amended § 727 complaint related back to the original § 727 complaint, and because the amendments were permissible under Rule 4004(b)(2), the bankruptcy court did not abuse its discretion in granting the UST leave to amend.

**B.    The bankruptcy court did not err in denying the Ravasias' discharge under § 727(a)(4)(A).**

**1.    Law governing § 727(a)(4)(A)**

The bankruptcy court may deny a chapter 7 debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account[.]" § 727(a)(4)(A). "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (9th Cir. BAP 1999) (citation omitted).

To prevail on a claim under this section, a plaintiff must show, by a preponderance of the evidence, that: "(1) the debtor made a false oath in

connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." *In re Retz*, 606 F.3d at 1197 (citations omitted).

"A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." *Khalil v. Devs. Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (9th Cir. BAP 2007), *aff'd*, 578 F.3d 1167 (9th Cir. 2009); *see also In re Searles*, 317 B.R. at 378. It is crucial to the proper operation of the bankruptcy system that chapter 7 debtors "ensure to the greatest extent possible that the information turned over to the bankruptcy court is accurate." *In re Retz*, 606 F.3d at 1199; *see also In re Searles*, 317 B.R. at 378 ("The continuing nature of the duty to assure accurate schedules of assets is fundamental because the viability of the system of voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial affairs.").

The second element necessary for a § 727(a)(4)(A) claim is that the false oath relate to a material fact. "A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. An omission or misstatement that detrimentally affects administration of the estate is material." *In re Retz*, 606 F.3d at 1198 (citations and quotation marks omitted).

17

The third element necessary for a § 727(a)(4)(A) claim is that the debtor makes the false oath knowingly. "A debtor acts knowingly if he or she acts deliberately and consciously." *Id.* (citations and quotation marks omitted) (debtor's signing of schedules when he knew the information was incomplete was sufficient to support a finding that the debtor acted knowingly).

Finally, to prevail on a claim under § 727(a)(4)(A), the objecting party must establish that the debtor's false oath was made fraudulently. "Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct." *Id.* at 1199 (citing *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir. 1985); *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 884 (9th Cir. BAP 2005), *aff'd and remanded*, 241 F. App'x 420 (9th Cir. 2007)). "Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent." *Id.* (citing *In re Khalil*, 379 B.R. at 172). But "the existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, can be found to constitute reckless indifference to the truth satisfying the requisite finding of intent to deceive." *In re Khalil*, 379 B.R. at 175 (citation omitted).

2.    **Analysis**

The Ravasias raise several challenges to the bankruptcy court's decision to deny discharge. First, they challenge the court's finding of knowing and

fraudulent false oaths about their expenses, arguing that chapter 7 debtors do not have a duty to report expenses that did not exist at the time of the filing. The court found that the Ravasias made a false oath by intentionally underreporting their expenses by nearly $20,000 per month.

The evidence showed that the Ravasias failed to disclose several credit cards on which they were making payments, in addition to other luxury expenses, and that these expenses existed at the time of filing. The chapter 7 trustee testified that the Ravasias continued to use and pay for credit cards and other expenses that were not listed on Schedule J. He testified that he requested their credit card information to see what the expenditures were, because there was no change in lifestyle yet the bills were getting paid. In addition, the evidence showed that the Ravasias were spending on average $45,000 per month, as compared to the $26,000 they reported on Schedule J. Clearly, the Ravasias did not comply with their duty to provide an accurate account of their monthly expenditures.

The Ravasias argue that, while perhaps Schedule J was inaccurate, their monthly expenditures were difficult to project at the time of filing given Mrs. Ravasia's extensive travel to obtain employment and the expenses of the failed medical clinic that were being paid off by credit cards. While that may be true, the point is that significant debts were being paid off by credit cards and other means. But it takes income to do that, and the income the Ravasias reported was insufficient to do so given their other debts.

19

The Ravasias argue that underestimating expenses could not impact the bankruptcy estate or prejudice creditors and should have not resulted in a denial of discharge. In other words, they argue that their underreporting of expenses was not material. We disagree. "Nondisclosure of creditors (and debts) can be just as important as nondisclosure of assets. Information regarding business and personal dealings can lead to discovery of assets, potentially avoidable transfers, or other relevant information such as grounds to deny a debtor's discharge." *In re Khalil*, 379 B.R. at 177. "'A false statement or omission may be material even if it does not cause direct financial prejudice to creditors.'" *Id.* (quoting *In re Wills*, 243 B.R. at 63). "[A] discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition." *In re Wills*, 243 B.R. at 63 (citation omitted).

The Ravasias' monthly expenses bore a relationship to their business and personal transactions and concerned the discovery of the existence and disposition of their assets. Their underreporting of expenses also adversely affected the trustee's ability to fully investigate their financial condition, detrimentally affected the administration of the estate, and prejudiced creditors. Both the chapter 7 trustee and the UST testified that, had the Ravasias provided accurate income and expenses information, they would have handled the case differently. Specifically, they likely would have sought

to convert the case to chapter 11, and the chapter 7 trustee (who also has extensive chapter 11 experience) testified that there would have been a substantial distribution to creditors through a plan.

Next, the Ravasias argue that in business debt cases, unlike consumer debt cases, there is no legal requirement to provide future averages of net income or gross wages for the months or year following the bankruptcy filing. They argue that the bankruptcy court erred by using postpetition income in hindsight to find that they made false statements, when Schedule I does not require them to forecast future income or average past fluctuating income. They argue that their statements with respect to income were not false as a matter of law, because they had no obligation to provide anything more than a "snapshot" of their income at the time the petition was filed.

The only case the Ravasias cite in support of their argument is *Westland Architecture & Development Corp. v. Matthews (In re Matthews)*, Adv. No. 2:12-01499-RK, 2016 WL 5746251 (Bankr. C.D. Cal. Oct. 3, 2016), an unreported case from a California bankruptcy court. *Matthews* was not a business debt case. Further, it does not help the Ravasias. While the court stated that a debtor's income as calculated on Schedule I is a "snapshot" of the debtor's income at the time the petition is filed, it also noted that a debtor's income as calculated on Schedule I is an "**estimate of average projected income**." *Id.* at *26 (emphasis in original). In other words, it considers future income.

The bankruptcy court was aware that this was a business debt case. Contrary to the Ravasias' argument, the court did not impose an improper legal requirement with respect to the reporting of income. The court was allowed to consider Mr. Ravasia's historical income from 2013 to 2016 and what he actually made in 2017, as well as what Mrs. Ravasia made in 2017, to determine the truthfulness of what they reported on their Schedule I and Amended Schedule I.

Further, Schedule I contemplates not simply a "snapshot" of monthly income but the forecasting of such income for the year with question 13, which asks if the debtor expects an increase or decrease "within the year" after the bankruptcy filing. And the publicly available instructions for filling out bankruptcy forms instruct debtors to "give details about the monthly income you currently expect to receive," i.e., in the future, and to "show all totals as monthly payments, even if income is not received in monthly payments," and if the "income is received in another time period, such as daily, weekly, quarterly, annually, or irregularly," i.e., irregular overtime/ bonus income, "calculate how much income would be by month." *See* Instructions: Bankruptcy Forms for Individuals at 28, available at https:// www.uscourts.gov/sites/default/files/instructions_individuals.pdf (last visited Apr. 16, 2021). Finally, Attachment 1 to the Amended Schedule I – where the Ravasias stated their expectation that postpetition income would be less than it was prepetition – demonstrates that they understood the

instruction in Part 2 of Schedule I to "[e]stimate monthly income as of the date you file this form" to mean expected income going forward, not a snapshot on the day of filing.

The Ravasias also argue that, in a chapter 7 case, there is no duty to amend to update postpetition changes in income or to retroactively add income that was not earned and did not exist at the time of the filing. They argue that the bankruptcy court could not have found a false oath with respect to their income or that one was made knowingly and fraudulently for failure to perform a non-existent duty.

The Ravasias' argument misses the point. Regardless of any duty to update postpetition changes in income, they did have a duty to assure accurate schedules. The evidence showed that Mr. Ravasia made substantially more money in 2017 than what the Ravasias reported, and that they knew such income existed at the time of filing. At minimum, the Ravasias were required to amend and report a more accurate figure for Mr. Ravasia's income once the inaccuracy became apparent. *See In re Searles*, 317 B.R. at 378 ("Postpetition discovery of rights that actually existed at the time of filing must be addressed in the schedules. This implies a duty to amend."). They did not do so, at least not until over two years later and only after the UST started asking questions. *See id.* at 377 (failure to amend schedules promptly upon noting the discrepancy supports an inference of intent). When the Ravasias did amend, they falsely reported that Mr. Ravasia made even

less money in 2017 than what they reported before. Their continued false oath as to Mr. Ravasia's income in the Amended Schedule I further established an intent to deceive.

The Ravasias next argue that their reliance on their counsel's advice for filling out their schedules was reasonable, and that the bankruptcy court erred in finding that their reliance was not in good faith because the "erroneous" information "should have been evident." "Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts. However, the debtor's reliance must be in good faith. The advice of counsel is not a defense when the erroneous information should have been evident to the debtor." *In re Retz*, 606 F.3d at 1199 (internal citations omitted). The advice of counsel is also not a defense "'when it is transparently plain that the property should be scheduled.'" *Shoemaker v. U.S. Tr. (In re Shoemaker)*, BAP No. CC-18-1020-KuFL, 2019 WL 2774265, at *15 (9th Cir. BAP July 1, 2019) (quoting *In re Mascolo*, 505 F.2d 274, 277 n.4 (1st Cir. 1974)).

The bankruptcy court found that the advice-of-counsel defense was not available because it should have been, and admittedly was, evident to the Ravasias by no later than July 2017 that their schedules were inaccurate. We see no error in that finding. Further, the Ravasias did not present any evidence at trial that their attorney advised them to make the specific false oaths they made. *See id.* (affirming denial of discharge under § 727(a)(2)(A)

24

and (a)(4)(A) where there was no evidence that counsel had advised debtor not to disclose assets). Accordingly, the bankruptcy court did not err in rejecting the reliance on counsel defense in this case.

Lastly, the Ravasias argue that the bankruptcy court improperly relied on standards relating to an overall "means" analysis in determining whether they made false oaths. The Ravasias argue that by analyzing pre- or postpetition income and expenses, as well as bank deposits and withdrawals, the court was applying the "means test" or "totality of the circumstances test" used to dismiss or convert a chapter 7 case to chapter 11 or 13. They argue that such tests apply only in consumer debt cases.

While these tests do apply in consumer debt cases under § 707(b), the Ravasias do not cite any authority that it was error for the court to consider some of this same type of evidence in a business debt case to determine a false oath and deny discharge under § 727(a)(4)(A). In the usual corporate-type business debt case under chapter 7, a discharge of debts is not at issue. But in this case it was. The fact that this was a business debt case did not insulate the Ravasias from making false statements in their schedules or at the § 341(a) meeting or from abusing the bankruptcy system. Therefore, we do not believe that the bankruptcy court erred in considering the income and expense evidence to find a false oath and deny discharge. The Ravasias' underreported expenses, especially when combined with their underreported income, supported the bankruptcy court's ultimate finding that their

misrepresentations and omissions about their income and expenses were an intentional and material false oath.

The bankruptcy court declined to address the additional allegation that the Ravasias made a false oath related to their 2016 income tax refund. We conclude that they did, and that this is an additional basis to affirm.

The UST presented evidence that the Ravasias knew when they filed their chapter 7 case that they were getting a refund of at least $28,000 (and maybe as much as $100,000), yet they represented in their schedules that any potential refund was "unknown" and valued it at $0. Emails between the Ravasias and their accountant in December 2016 revealed that such a refund was likely, that the chapter 7 trustee would inquire about the amount of the refund anticipated, and that Mrs. Ravasia was searching for ways to prevent the bankruptcy estate from getting it.

Mrs. Ravasia testified that she did not disclose at the § 341(a) meeting that she had spoken to her accountant about the tax refund and that it could range from $28,000 to $100,000, because she was trying to answer "yes" or "no" to the questions being asked. The chapter 7 trustee testified that, based on the schedules and the Ravasias' testimony at the § 341(a) meeting, he was led to believe that a refund, if any, would be de minimis. However, he testified, had he known that a minimum of $28,000 was coming to the cash-poor estate, he might have litigated against (as opposed to settling with) Mr. Ravasia's employer over whether Mr. Ravasia's deferred employee

compensation plan – which was a significant asset – was an estate asset, and the outcome may have been more favorable to the estate and creditors. In any case, he said he certainly would have done more follow up had the extent of the tax refund been disclosed. Ultimately, the Ravasias received a tax refund of $177,000. The chapter 7 trustee only learned about the refund after reviewing a copy of the UST's deposition of Mrs. Ravasia. It does not appear that the Ravasias ever filed an amended Schedule A/B to correct the false information about the tax refund.

Accordingly, the evidence established that the Ravasias' false statements and omissions about their 2016 income tax refund constituted a false oath, that it was material, and that it was made knowingly and fraudulently.

## CONCLUSION

For the reasons stated above, we AFFIRM.